No. 48,054

In the Matter of the Estate of Nellie Mae Carothers, Deceased.

(552 P. 2d 1354)

Opinion filed July 23, 1976.

*J. Eugene Balloun,* of Payne & Jones, Chartered, of Olathe, argued the cause, and *Lynn F. Taylor, II,* of the same firm, and *Joseph Caresio,* of Kan-

sas City, Missouri, were with him on the brief for the appellant, Margaret I. Stipancich.

Robert Martin, of Martin, Pringle, Schell & Fair, of Wichita, argued the cause, and Larry B. Spikes, of the same firm was with him on the brief for appellee, Bob N. Cardwell. Robert A. Anderson, of Anderson, Byrd & Richeson, of Ottawa, was on the brief for the appellee, The School of Dentistry of the University of Missouri at Kansas City, and Gwinn G. Shell, of Garnett, was on the brief for the appellee, First Methodist Church, Garnett, Kansas.

The opinion of the court was delivered by

MILLER, J.: This is an appeal from an order admitting to probate the will of Nellie Mae Carothers dated July 24, 1972. The appellant here is Margaret I. Stipancich, daughter of the deceased and a devisee under the will. The appellees are Bob N. Cardwell, designated as executor, and a legatee, and the School of Dentistry of the University of Missouri at Kansas City and the First Methodist Church of Garnett, Kansas, to whom substantial bequests were made.

Bob Cardwell petitioned to have the will admitted to probate. Margaret Stipancich filed written defenses, and also a petition to admit to probate an earlier will, dated July 13, 1970. The district court, upon transfer, heard the matter, made extensive findings of fact and conclusions of law, and ordered the 1972 will admitted to probate. Margaret appeals.

The principal issue is whether Mrs. Carothers lacked testamentary capacity at the time she executed the will.

We turn first to the factual background. Mrs. Carothers was married three times. Her first marriage ended in divorce shortly after the birth of her daughter, Margaret, in 1924. Her second marriage was terminated by her husband's accidental death in 1931. Her third marriage was to Dr. Frank C. Carothers. Shortly after their marriage in 1934, they took up residence in Garnett, Kansas, where Dr. Carothers practiced dentistry until his death.

Margaret was raised by her grandparents in Kansas City, Kansas. She never lived with her mother in Garnett. After her marriage to Nick Stipancich she continued to reside in Kansas City, Kansas, where she and her husband purchased a home. Due to financial difficulties they were about to lose their home in 1960 through foreclosure of the mortgage. Dr. Carothers advanced funds so that the home could be redeemed, and Margaret and her husband conveyed title to the property to him. These "loan" funds were not

repaid, and this was a bone of contention, appellant claiming that Dr. Carothers was to leave the house to her by his will, and Mrs. Carothers contending otherwise.

During the last several years preceding her death, Mrs. Carothers was not in good health. She suffered from recurring migraine headaches, and she was hospitalized several times. During the last half-dozen years of her life she frequently indulged in the use of alcohol to excess. At first her use of alcohol was prompted by her husband's declining state of health. After his death in 1969 her mental and physical state continued to deteriorate and within a month after his death she was hospitalized twice following suicide attempts. Though she was particularly depressed, and over-indulged in the use of alcohol immediately after her husband's death, her dependence upon alcohol declined substantially during the last year of her life, and she resumed an active social life without it. Prior to 1969, Mrs. Carothers made occasional use of morphine, codeine and demerol. Following her suicide attempts in 1969 she received numerous prescription drugs for her headaches and depression as well as for other illnesses; however, in the last months of her life her dependence upon drugs diminished considerably. During this period of time she was receiving injections for pain by her physician. The trial court specifically found that the records of her physician, Dr Stevens, reflect that for a period of approximately six weeks prior to June 8, 1972 (when she gave instructions to her attorney, Fred Mitchelson, for the drafting of her will), and for 10 days prior to July 24 (when the will was executed), she was given no drug injections. According to the testimony of Dr. Stevens, the significant effects of the drugs administered would not last more than 24 hours, and all effects would disappear within a week.

In 1969, after the death of Dr. Carothers and following Mrs. Carothers' suicide attempts, Margaret Stipancich and Josephine Cardwell Cusintz, Mrs. Carothers' sister, drove down from Kansas City to see Clark Howerton, a Garnett attorney, to examine commitment papers prepared by Howerton at the request of Mrs. Cusintz. Neither woman was willing to sign the papers to commit Mrs. Carothers, so no proceedings were commenced. Sometime in 1970, Mrs. Carothers was told by someone that her daughter had sought to commit her to the Osawatomie State Hospital. Margaret testified that until she and her mother ceased communicating in January, 1971, her mother often accused her of seeking

to commit her. The only other testimony in the record that indicated the testatrix ever mentioned the alleged commitment attempt came from a housekeeper who said that she mentioned it once in August, 1970, and from Everett Burns, a family friend (to whom Mrs. Carothers left $10,000 by the 1970 will), who recalled her mentioning it three or four times in 1971 and possibly once in 1972. The trial court specifically found that appellant's evidence on this issue, particularly as to any conversations subsequent to January 2, 1971, lacks corroboration, and in the context of her position in this case is self-serving. The trial court noted that Mrs. Carothers failed to mention the alleged attempted commitment to attorney Mitchelson on either June 8, or July 24, 1972, assigning instead other reasons for decreasing her daughter's share of her estate.

Mrs. Carothers actively participated in numerous business dealings shortly before the execution of her will. She acted, without criticism of her performance, as the executrix of her husband's estate, and she apparently understood the estate tax and sought a refund of a portion of the tax paid. She was involved in several land and financial transactions involving funds of up to $100,000 in the spring and summer of 1972. And she discussed her portfolio and exhibited some knowledge of the stock market.

On June 8, 1972, Mrs. Carothers first consulted Fred Mitchelson, an attorney in Pittsburg, Kansas, for assistance in several legal matters. Included among them was an application for a refund of part of the federal estate taxes paid in Dr. Carothers' estate, and the preparation of a new will. Mrs. Carothers told Michelson that she was disappointed with Margaret and her husband concerning their failure to repay funds which Dr. Carothers had expended to purchase the home in which her daughter and husband were living. Margaret had filed a claim against the estate of Dr. Carothers, claiming that she was entitled to receive the home under his will. After Mrs. Carothers refused to give Margaret the property, Margaret became delinquent in making the monthly payments due. An eviction notice was served. Relations between mother and daughter became strained, and contacts were limited to one or two telephone calls after January, 1971. The continuing controversy between Mrs. Carothers and Margaret over Margaret's home was one of the reasons given by Mrs. Carothers to her attorney, Mitchelson, for not leaving Margaret anything other than the home.

On July 24 Mrs. Carothers, by prearrangement, returned to Mitchelson's office to execute the will, and after a few corrections were made, she did so. The witnesses to her behavior on or about June 8 and July 24 described her as normal, apparently well, and not under the influence of either alcohol or drugs.

The trial court found the will of July 24, 1972 to have been properly executed and to be the last will of Nellie Mae Carothers. It found that on the date she instructed her attorney and on the date she signed the will, she was not under the influence of alcohol, medicine or drugs; that she knew and recognized her relatives and the natural objects of her bounty, and that she comprehended the nature and extent of her property; that she was not then under the influence of other persons; and that she understandingly formulated and embodied in the will a plan of distribution which was lawful and reasonable under the circumstances. Finally, the court determined that the troubles between Mrs. Carothers and her daughter were real rather than imaginary, and had sufficient basis in fact that they were not the product of an insane delusion.

Appellant first contends that the trial court erred in failing to give proper credit to the evidence and testimony concerning what appellant characterizes as an insane delusion of the testatrix: that appellant sought to have her confined in a state hospital.

The litigants do not disagree concerning the state of the law on this issue, but part company as to the application of those principles. In *In re Estate of Millar*, 167 Kan. 455, 207 P. 2d 483, cited in both briefs and by the trial court in its conclusions of law, this court set forth a definition of an insane delusion as follows:

" '. . . the meaning of insane delusion, in its legal sense, is "a belief in things impossible, or a belief in things possible, but so improbable under the surrounding circumstances, that no man of sound mind could give them credence." . . . to avoid a will upon that ground the delusion must be an *insane delusion,* and that the will was the *product* of that delusion.' (*Johnson v. Johnson,* 105 Md. 81, 85, 65 Atl. 918, 121 Am. St. Rep. 570.)

"A belief does not amount to—

" 'An insane delusion, unless it appears that his belief was wholly without any basis whatever, and that the testator obstinately persisted in it against all argument which may have been employed to dissuade him. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion.' (*Stull v. Stull,* 1 Neb. (Unof.) 389, 396, 96 N. W. 196.)

.   .   .   .   .   .   .   .   .   .   .   .

" '. . . An insane delusion such as will affect testamentary capacity is an idea or belief which has no basis in fact or reason and to which the testator

adheres against reason and evidence, or, in other words, it may be stated to be a belief in a state of facts that does not exist and which no rational person would believe to exist. . . .' " (68 C. J. 433, § 30.) (pp. 459, 460.)

Appellant urges in support of reversal the case of *Harbison v. Beets*, 84 Kan. 11, 113 Pac. 423, wherein this court affirmed a lower court ruling that set aside the will of the testator because of mental unsoundness that, this court said, resulted in a lack of testamentary capacity. *Harbison* offers little assistance to appellant here since the claim there that the trial court's findings were not supported by the evidence was rejected. The trial court in *Harbison* set aside the will; here it refused to do so. As this court pointed out in *Harbison*:

"It is insisted that the findings are unsupported by the evidence, and that some of them are contrary thereto, but from the lips of more than fifty witnesses fell testimony sufficient to support either theory of the case." (p. 12.)

This court in *Harbison* treated the case as a question of whether there was substantial competent evidence to support the findings of the trial court and concluded:

". . . [T]hat the testator entertained such notion [insane delusion] is abundantly shown by the evidence . . ." (p. 18.)

In this case the undisputed evidence was that attorney Howerton prepared commitment papers for the testatrix in 1969 and discussed them with the appellant. Apparently on the basis of some or all of the facts surrounding that meeting the testatrix formed the opinion that the appellant had attempted to have her committed. But if appellant had no such intention the fact that the testatrix was mistaken in her belief is not an insane delusion simply because the basis for the belief would be insufficient for others, if there was some foundation for it in fact. *Millar*, supra. Also under *Millar* any will sought to be set aside must first be shown to be a product of that demonstrably insane delusion. Certainly the events of June 8 and July 24, 1972, established by uncontroverted evidence, provided ample support for the trial court's finding that the will was not the product of a belief on the part of the testatrix that her daughter wanted to confine her, but rather was the result of her disappointment in her daughter during the controversy concerning the latter's house and as the result of their estrangement since January, 1971.

As we said in *Akins v. Akins*, 109 Kan. 453, 199 Pac. 922:

". . . A mistaken belief entertained by one that he has been wronged

by another is a very common frailty of humanity, but such belief is not necessarily an insane delusion. . . ." (p. 456.)

There is substantial competent evidence to support the decision of the trial court that the testatrix did not lack testamentary capacity due to an insane delusion when she executed her will on July 24, 1972.

Appellant next contends that if the belief of the testatrix that appellant sought to have her committed was not an insane delusion, it was at least the result of undue influence or fraud practiced upon the testatrix by her sister, Josephine Cardwell Cusintz. In *Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634, this court set forth the elements necessary to destroy the validity of a will because of undue influence. The actions complained of:

". . . must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. It must be brought to bear directly upon the testamentary act . . ." (Syl. 1.)

Appellant contends, however, that if the testatrix's belief that appellant sought to confine her was the result of statements made by appellant's aunt, that was certainly undue influence amounting to fraud inasmuch as such accusations would have been false. However, there is no evidence that any influence Josephine may have had upon the testatrix was brought to bear directly upon the testamentary act as it must be in order to destroy testamentary capacity to make a valid will. *Ginter*, supra. Once again there was substantial competent evidence to support the decision of the trial court that the testatrix did not lack testamentary capacity due to undue influence when she executed her will on July 24, 1972.

The appellant had the burden of proof with respect to her defenses of lack of testamentary capacity because of insane delusion and undue influence. *In re Estate of Birney*, 177 Kan. 624, 281 P. 2d 1098; *In re Estate of Arney*, 174 Kan. 64, 254 P. 2d 314. The trial court found that the appellant did not carry this burden. As we pointed out in *In re Estate of Smith*, 168 Kan. 210, 212 P. 2d 322, our only concern on appeal is:

". . . whether there was substantial testimony to support the trial court's finding of capacity and not with conflicting evidence. We do not weigh or compare conflicting testimony. The comparison of such testimony and the weight to be accorded thereto, under the rule obtaining in this state, are matters resting solely in the province of the trial court and not in the appellate court. . . ." (pp. 215, 216.)

Here, as in *Harbison,* there were numerous witnesses appearing on both sides of the question of the capacity of the testatrix. The trial court, as the finder of fact, chose to believe that testimony offered by the appellees. Though the appellant couches the court's disbelief as "a failure to consider" certain testimony and evidence, it is clear from the findings of the court that it *considered* appellant's testimony—it just did not accept it as true.

Here there was substantial competent evidence supporting the trial court's decision to admit the will to probate. We cannot reweigh the evidence.

Appellant objects to the trial court's refusal to consider certain lay and expert testimony. As just pointed out no reversible error may be predicated upon such a charge inasmuch as the court is not required to believe all testimony presented to it. Appellant also complains that the trial court refused to permit Dr. Lytton, a psychiatrist who treated the testatrix in 1969, to testify as to whether she was influenced in the making of her will on July 24, 1972 by an insane delusion. The court had earlier permitted the doctor to give his opinion that the testatrix lacked testamentary capacity on that date because she was a victim of an insane delusion, and the court simply ruled that the doctor had already answered the question, as it would seem that he had.

Finally, appellant contends that the trial court erred in restricting the testimony of Dr. Stevens. We have reviewed the record and find no substance to this complaint. As we observed in *Millar,* supra, both expert and lay testimony is competent on the question of mental capacity. The trier of facts is not bound to adopt the views and opinions of a physician, no matter how highly qualified, and to reject nonexpert testimony. The court may weigh the testimony of all witnesses on the question and follow that evidence which the court as trier of fact finds is entitled to the most weight and credence. We are convinced that the trial court properly considered the evidence before it.

This case was well presented by able counsel on both sides. Abundant evidence supporting the claims of all litigants was offered and received. The trial court weighed the evidence presented and announced its decision in a comprehensive and carefully prepared memorandum. The decision is supported by substantial competent evidence.

*Finding no error, we affirm the judgment.*