No. 86,349

In the Matter of the Estate of JAMES W. FARR, Deceased.
(49 P.3d 415)

Opinion filed July 12, 2002.

*Keith Martin,* of Smith, Shay, Farmer & Wetta, of Wichita, argued the cause, and *Faith A. J. Maughan,* of the same firm, was with him on the brief for appellants Suzette Hickey and Janell Rangel.

*John Ray Shirley,* of Wallace, Brantley & Shirley, of Scott City, argued the cause for appellees and was on the brief for appellee Marvin J. Farr; *Gerald O. Schultz,* of Garden City, was on the brief for appellee Howard Farr.

The opinion of the court was delivered by

LOCKETT, J.: This is an appeal from the district court's order admitting a will to probate. The two opponents to the will, Suzette Hickey and Janell Rangel, were the decedent's heirs at law but were not named as beneficiaries in his will. The opponents claim the district court erred in finding (1) the will was executed with testamentary formalities; (2) the opponents to the will must show lack of testamentary capacity by clear, satisfactory, and convincing

evidence; (3) the decedent possessed testamentary capacity; (4) the will was not the product of undue influence; and (5) the opponents saw the deceased no more than three times each during the last 8 years of decedent's life.

James W. Farr died November 29, 1999, at Terrace Garden Care Center (Terrace Garden), an intermediate care facility, where he had been a resident since October 9, 1996. The cause of death was listed as "severe progressive dementia." Farr was survived by his two sons, Marvin and Howard, and two granddaughters, Suzette and Janell, daughters of Farr's deceased son Everett. Farr was described as "stubborn, hard-headed, and sometimes difficult," and the type of person that would tell you if he was upset with you.

A petition to submit Farr's will to probate was filed December 6, 1999. The will had been executed on July 2, 1997, named Marvin as executor of the estate, and devised and bequeathed the entire estate to Marvin and Howard equally. The will contained no provision regarding Everett or Everett's daughters. Suzette and Janell objected to the admission of the will to probate, claiming the will was not properly executed and that Farr either lacked testamentary capacity or was under undue influence in executing the will. A 2-day bench trial was held.

At trial, Keen Brantley, Farr's attorney of nearly 30 years and scrivener of the will, testified that the 1997 will was an exact duplicate of Farr's 1991 will, which had been lost. Brantley recalled that the 1991 will was drafted shortly after Farr's wife died intestate, named Marvin as the executor, and devised all the property to Marvin and Howard in equal shares.

After his wife's death in 1990, Farr discovered that land he believed was held in joint tenancy with his wife was not so held and that half of his wife's interest in the property would pass to her heirs at law. Farr requested, via a letter by Brantley, that Marvin, Howard, Suzette, and Janell quitclaim their interest to him. Brantley testified Farr was upset when one of the opponents to the will conditioned conveyance upon the other heirs conveying their interest and the other opponent indicated she did not want to convey the property. Brantley's letter to the heirs indicated that the deeds would be returned if any of the heirs did not agree to the quitclaim.

Brantley informed Farr that Marvin and Howard had agreed to convey the property. Marvin and Howard never deeded the property back to Farr.

In 1996, prior to Farr moving into Terrace Garden, Farr notified Brantley on at least two occasions that he was unable to locate the 1991 will. Brantley explained to Farr on each occasion that he could draw up another will with the same provisions and that Farr could reexecute it. Shortly after Farr moved to Terrace Garden, Farr again contacted Brantley about the missing will. During that conversation, Farr requested that Brantley draft another will just like his previous will. Later, Brantley received a call from an unknown woman at Terrace Garden who claimed to be calling at Farr's request and who inquired as to the progress on Farr's will. Brantley recalls having the copy of the 1991 will in his office when the 1997 will was drafted and that someone in his office had merely retyped the provisions of the 1991 will. Brantley was unable to produce a copy of the 1991 will or any documents to show the 1991 will ever existed.

On July 2, 1997, Brantley went to Terrace Garden to execute the will. Brantley testified that after engaging in some small talk with Farr, he gave a copy of the will to Farr and read the will aloud to him. Harriet Kretzschmar, the director of nursing at Terrace Garden, was present when Brantley read the will to Farr.

Brantley testified that Farr identified, in the presence of Harriet and Christine Pokorney, a registered nurse, that he owned farmland, machinery, cash investments, a home in Scott City, and an oil well; said that he was leaving his property to Marvin and Howard; and indicated he was ready to sign the will when asked. Farr had failed to mention that he owned a tavern and a modular home. Harriet also testified that Farr identified Marvin and Howard as being his children and that he had identified some of his property; however, the property identified differed somewhat from Brantley's testimony.

Christine testified at her deposition, which was admitted into evidence at trial, that Brantley had asked Farr who he was leaving his property to and what property he had, that Brantley told Farr that his two sons were mentioned in the will and listed off the

property Farr owned, and that Farr responded affirmatively by shaking his head. Christine did not recall Farr having made any audible responses to Brantley's questions. During cross-examination, Christine admitted that it was possible Farr had named his property and his children, but testified she did not remember. She stated that Farr's main concern was that this new will was like his prior will. Brantley had assured Farr that this will was just like his prior will.

Farr signed the will in the presence of Brantley and the subscribing witnesses, Harriet and Christine. During the execution of the will there was no mention of Farr's granddaughters.

As for Farr's state of mind on July 2, 1997, Brantley testified that Farr recognized him, there was no indication Farr was unaware of what he was doing, and there was no indication that Farr did not sign the will freely and voluntarily. Brantley estimated that he has participated in drafting and executing over 1,000 wills.

Harriet, who saw Farr daily, believed Farr responded appropriately to the questions and conversations with Brantley and testified she did not doubt Farr willingly signed the will. She testified that Farr always recognized her, Marvin, and Lottie Farr, Marvin's wife.

Christine, who saw Farr approximately four times during the 6 months before the will was executed and had only visited with him briefly, testified that Farr did not seem confused at any of these visits. She testified that at the time the will was executed, Farr was not confused, his mood was appropriate, and he was alert and seemed to understand what was happening.

Up until the summer of 1996, Mary Lawrence was Farr's home nurse 14 hours a day, 7 days a week, for 3½ years. During her employment, she observed Marvin visit daily and Suzette visit twice, but testified Howard and Janell never visited. Mary testified that Farr had told her that his granddaughters would not be left anything because they never came to visit him.

Janell has resided in Colorado since she was a child. Janell and her husband Roman testified Janell's grandmother's property was quitclaimed to Farr as he had requested and denied that they put any condition on the deed. They claimed that it was not until 1996 that they discovered Janell still owned the property. Janell visited

Farr almost every summer and at least one holiday a year prior to her grandmother's death in 1990. After their marriage in 1990, at which Farr was a participant, Janell and Roman visited Farr on four occasions, the last visit being at the hospital in October 1996. At this last visit, Farr recognized Janell but did not recognize Roman. In the times they have seen Farr since Janell's grandmother's death, Farr did not seem angry or more distant and the visits were good. At the reading of the will, Brantley indicated to Janell that she and Suzette had been left out of the will because they did not convey the land to Farr as Farr had requested.

Suzette has lived in Oregon since 1996. She testified that after Brantley sent the letter about conveying her grandmother's land to Farr, she spoke with Brantley. Brantley indicated to Suzette that she was in Farr's will and that she should convey the land in order to avoid upsetting Farr. At that time, Brantley told her that he was unsure whether Howard would quitclaim the land to Farr, so Suzette decided to wait and see what the others were doing. Suzette heard nothing further about the matter. Brantley denies having ever told Suzette or Janell that they were in Farr's will, instead recalling that he had told one of the them that Farr was upset with them and that it would be shortsighted of them not to convey the land. Suzette lived with Farr for nearly 3 years prior to her grandmother's death and for a 3-to 4-month period after her death, ultimately moving out because Farr was too emotional and had mood swings. Suzette last saw Farr in October 1999 at Terrace Garden. At that time Farr was confused and was unable to carry on a conversation. Howard told Suzette of an incident when Farr had been unable to recognize his (Farr's) sister. Farr never expressed any anger towards Suzette during any of their conversations since her grandmother's death.

Joan Scofield, Suzette and Janell's mother, was married to Farr's son Everett for 7½ years before Everett died in a car accident. Joan stayed in the area for a time after Everett's death, eventually remarrying and moving away. When Everett passed away, he owned farmland. Joan kept the land for a while and then eventually sold it. Brantley testified that in 1991, Farr was upset with the sale

of this land, with how Joan had handled the proceeds of the sale, and with Joan's remarriage.

Marvin Farr, who held a durable power of attorney for Farr since 1993 and visited Farr at least weekly while Farr was at Terrace Garden, testified that Farr never told him that he was angry at Janell and Suzette. Marvin also stated that Farr did not usually discuss things like that with him. Marvin testified he believed Farr recognized Janell, Roman, and Joan when they visited Farr in the hospital in 1996 because after they left Farr asked, "What the hell they doing here?" and told Marvin, "I don't—didn't really want them here, didn't want you calling them."

Dr. Michael Jackson became Farr's physician when Farr came to live at Terrace Garden in 1996. It was Dr. Jackson's practice to visit his patients at Terrace Garden once every 60 days and additionally if necessary. When he first met with Farr, he discovered Farr had been diagnosed as suffering from dementia. Dementia is a chronic disease resulting in loss of mental function or cognitive ability that takes years to progress. Dr. Jackson testified that people suffering from dementia may have days in which they are "more on top of things" and other days when they are not, stating that physical health on that particular day may be a factor. Dr. Jackson testified that upon meeting Farr in the fall of 1996, Farr was in a "moderate to even a severe demented state," and later testified that Farr was in a severe state of dementia at that time. Dr. Jackson opined that it would have been "very difficult, at best, for [Farr] . . . to know what he was doing and perhaps what he had" on the day the will was executed. Farr never recognized Dr. Jackson.

On cross-examination, Dr. Jackson testified that he had stated in his deposition that people who observed Farr daily and on the day the will was executed would be in the best position to know whether Farr was having a "good day or bad day." Dr. Jackson also admitted that he had stated at his deposition that is was possible that Farr "could have known his possessions, could have known these people and perhaps what his initial will in regard to those were—were on a good day, he might not have been agitated, he might have interacted well with the staff or family and be able to

express these." Dr. Jackson admitted he never extensively evaluated the level of dementia Farr was suffering and its progression.

Medical records submitted to the trial court indicated that Farr suffered a great deal of confusion, had problems with his memory, and was taking medication at the time the will was executed. The medication was to control hostility and agitation, and could have had a sedative-type effect.

The trial court, in a memorandum decision, found that the will was executed in accordance with all testamentary formalities, that Farr had testamentary capacity at the time of execution, and that the will was not the product of undue influence. Suzette and Janell filed a motion to reconsider, which was summarily denied. The trial court entered an order admitting the will to probate on November 27, 2000. A timely notice of appeal was filed. This court has jurisdiction over this case by transfer on its own motion pursuant to K.S.A. 20-3018(c).

## TESTAMENTARY FORMALITIES

Opponents contend the trial court erred in finding Farr's will was executed with testamentary formalities. Specifically, opponents assert the trial court erred (1) in not finding the self-proving affidavit invalid; (2) in finding the testimony of the witnesses was sufficient to allow the will to be submitted to probate; and (3) in finding Harriet was a disinterested witness.

Where the trial court has made findings of fact and conclusions of law, the appellate court's function is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *In re Estate of Reynolds*, 266 Kan. 449, 461, 970 P.2d 537 (1998).

When offering a will to probate, the burden of proof is initially upon the proponent to make a prima facie case showing capacity

and due execution of the will. See K.S.A. 2001 Supp. 59-2224; *In re Estate of Perkins*, 210 Kan. 619, 624, 504 P.2d 564 (1972); *Amerine v. Amerine, Executor*, 177 Kan. 481, Syl. ¶ 6, 280 P.2d 601 (1955); *In re Estate of Peirano*, 155 Kan. 48, 49, 122 P.2d 772 (1942). It is well established in Kansas that once it has been shown that a will has been executed in accordance with the formalities required by law, the burden is upon the will contestant and he or she must produce evidence to support his or her position. *In re Estate of Haneberg*, 270 Kan. 365, 374, 14 P.3d 1088 (2000).

We note that the trial judge refused to find a prima facie case had been shown during the trial because the judge had not yet had the opportunity to read Christine Pokorney's deposition testimony. The memorandum decision did not specifically find the proponents established a prima facie case; however, the judge held that the proponents had shown by a preponderance of the evidence that the will was executed with testamentary formalities and that the burden of proof shifted to the opponents. In order for the burden of proof to have shifted to the proponents the trial judge necessarily found the proponents had put forth a prima facie case. See *Perkins*, 210 Kan. at 624.

### Self-Proving Affidavit

Opponents contend the trial court erred in failing to invalidate the self-proving affidavit because no oath was administered. In order to execute a valid self-proving affidavit, the testator and witnesses must be under oath at the time and the testator must declare that the document is his or her will and that it was freely and voluntarily executed. See K.S.A. 2001 Supp. 59-606. Here, the witnesses were not under oath at the time the self-proving affidavit was signed, nor did Farr specifically declare the will was his or that it was made freely or voluntarily. Even so, we need not address opponents' assertion that the self-proving affidavit was invalid, because the trial court did not rely upon the affidavit in determining that testamentary formalities had been met. The testimony of both subscribing witnesses was received into evidence at trial and was used by the trial court in admitting the will to probate. In addition, it is important to note that pursuant to K.S.A. 2001 Supp. 59-606,

if a will containing a self-proving affidavit is contested, the will is treated as if it contained no such affidavit. Thus, once a self-proved will is contested, the question of the validity of the self-proving affidavit is moot because the affidavit is no longer conclusive as to the admission of the will to probate.

### Sufficient Evidence to Admit Will to Probate

Opponents contend the testimony of the witnesses was insufficient to support the trial court's finding that all testamentary formalities had been met and that the will should be admitted to probate. As noted, the proponents of a will must put forth evidence establishing a prima facie case of capacity and due execution. See K.S.A. 2001 Supp. 59-2224.

A prima facie case of capacity requires a showing that the testator was of sound mind and majority at the time the will was executed. See K.S.A. 59-601. In this case, the proponents put forth the testimony of those present at the execution of the will. Although there were discrepancies in their testimony, all present at the signing of the will testified that Farr either proclaimed or acknowledged the majority of the assets in his estate and his intent to leave his property to his sons, Marvin and Howard. The witnesses testified that Farr was alert and that he seemed to understand what was happening. The record indicates Farr was 82 years old at the time of the execution of the will. Thus, there is sufficient evidence to support a prima facie case of capacity. See *Amerine*, 177 Kan. at 484 (prima facie case of capacity found where witnesses testified testator was of sound mind and no possible inference of lack of majority); *Peirano*, 155 Kan. at 51 (prima facie case found where testator appeared to know what he wanted, was keen and alert, recited who he wanted to receive property under the will, and described some of the assets that comprised his estate).

In order to establish a prima facie case of due execution, the proponents of a will must show compliance with K.S.A. 2001 Supp. 59-606. Pursuant to K.S.A. 2001 Supp. 59-606, a will must be: (1) in writing; (2) signed at the end by the testator or by another party in the presence and at the request of the testator; and (3) attested and subscribed in the presence of the testator by two or more

competent witnesses who saw the testator subscribe or heard the testator acknowledge the will. The attestation clause recites that the will was signed by the testator in the presence of the witnesses, at his request, and in his sight and presence and that the witnesses were also in the presence of each other. An attestation clause is presumptive evidence of the facts stated in it. *In re Estate of Arney*, 174 Kan. 64, 67-68, 254 P.2d 314 (1953).

Both subscribing witnesses to the will, as well as Brantley, also testified that Farr signed the will in the presence of the subscribing witnesses and that each witness signed the will in Farr's presence. Farr's signature appears at the end of the document just above the attestation clause. Thus, there has been compliance with the requirements of K.S.A. 2001 Supp. 59-606, and a prima facie case of due execution was shown.

### Disinterested Witness

Opponents contend the trial court erred in finding Harriet Kretzschmar was a disinterested witness. The trial judge found the will was witnessed by "two disinterested witnesses." Opponents claim Harriet was not disinterested because: (1) Harriet drove back and forth to work with Lottie Farr, Marvin's wife; (2) Harriet moved into Farr's home in early 1997, making the rent checks payable to Farr and delivering those checks to Lottie or leaving them for Marvin to pick up; (3) Harriet brought Marvin an unsigned copy of Farr's 1997 will the day it was executed; (4) Harriet sometimes joked she was Marvin's sister; and (5) Harriet sat in the front row with the family at Farr's funeral and was ahead of the opponents in the funeral procession.

Witnesses to a will are only required to be competent under K.S.A. 2001 Supp. 59-606 and are not required to be disinterested. Compare K.S.A. 59-608 (an oral will made in the testator's last sickness is valid with respect to personal property if it is reduced to writing and subscribed by two competent and *disinterested* witnesses within 30 days). Opponents make no allegation that either witness to Farr's will was incompetent, nor do the facts support such a finding. A witness who is also a beneficiary may lose all or a portion of the devise or bequest to him or her unless there are

at least two other subscribing witnesses who are not beneficiaries, pursuant to K.S.A. 59-604; however, even in such a case, the will still complies with testamentary formalities.

The trial court in finding that both Harriet and Christine were disinterested witnesses interpreted that to mean that they were "individuals who did not take from the Will." Neither Harriet or Christine were named as beneficiaries under Farr's will; thus, the trial court's finding of fact was not erroneous. Even if it were, however, the trial court's finding that the witnesses were disinterested is not required to support its decision to admit the will to probate and would be harmless error. See K.S.A. 60-2105.

## SHOWING LACK OF TESTAMENTARY CAPACITY

Opponents contend the trial court erred in ruling the opponents to the will were required to show lack of testamentary capacity by clear, satisfactory, and convincing evidence. Determination of burden of proof is a question of law over which this court has unlimited review. See *Fischer v. Kansas Dept. of SRS*, 271 Kan. 167, 175, 21 P.3d 509 (2001).

The trial court relied upon *Arney*, 174 Kan. at 67-68, for the proposition that an attestation clause serves as presumptive evidence and its recitals may only be overcome by clear, satisfactory, and convincing evidence, and *In re Estate of Bennett*, 19 Kan. App. 2d 154, 865 P.2d 1062, *rev. denied* 254 Kan. 1007 (1994), which held that clear, satisfactory, and convincing evidence is required. Opponents contend that because the attestation clause does not reference Farr's capacity, the burden of clear, satisfactory, and convincing evidence does not apply.

In *Bennett*, the Court of Appeals addressed this same issue with regard to the burden of proof necessary to show undue influence. In that case, the opponents of the will asserted that the level of evidence necessary to show undue influence was preponderance of the evidence and not clear and convincing evidence. After reviewing the cited authorities, the *Bennett* court held that they were either no longer controlling or were misstatements of the required standard of proof. 19 Kan. App. 2d at 163. The Court of Appeals relied instead upon cases in which this court stated that the stan-

dard of proof required to rebut a prima facie case was that of clear, satisfactory, and convincing evidence. 19 Kan. App. 2d at 163-64; see *In re Estate of Suesz,* 228 Kan. 275, 277, 613 P.2d 947 (1980); *Perkins,* 210 Kan. at 624; *In re Estate of Wittman,* 161 Kan. 398, 401-02, 168 P.2d 541 (1946); *In re Estate of Wallace,* 158 Kan. 633, 637, 149 P.2d 595 (1944). The *Bennett* court also noted that another reason for requiring clear and convincing evidence to prove undue influence is because undue influence is a species of fraud and that the burden of proving fraud has almost always been higher than preponderance of the evidence. 19 Kan. App. 2d at 164. In *Haneberg,* this court relied upon *Bennett* and required opponents alleging undue influence to prove their claim by clear, satisfactory, and convincing evidence. 270 Kan. at 374.

Opponents contend the *Bennett* court's primary rationale for requiring clear and convincing evidence was because undue influence is a species of fraud, claiming that there is no similar rationale with regard to testamentary capacity. The decision in *Bennett,* however, seems to have been based primarily upon prior Kansas cases and the recognition that historically substantial proof has been required to overcome a prima facie case. 19 Kan. App. 2d at 163-64. The analogy of the higher standard of proof required to show undue influence, a species of fraud, although undoubtedly influencing the court's decision, does not appear, as opponents contend, to be the primary basis for the *Bennett* court's decision.

This court has previously recognized that clear, satisfactory, and convincing evidence is the burden that must be met in challenging testamentary capacity. See *Suesz,* 228 Kan. at 277 (after proponents of will established prima facie case of capacity, a showing by clear, satisfactory, and convincing evidence was required to prove incapacity of the testator).

Kansas courts have also applied the burden of clear, satisfactory, and convincing evidence to other defenses to a will. See *Arney,* 174 Kan. at 67-68 (in claim that will was not properly executed and attested as required by law, attestation clause was presumptive evidence of facts stated in it and its recitals may only be overcome by clear, satisfactory, and convincing evidence); see also Feeney and Carmichael, *Will Contests in Kansas,* 64 J.K.B.A. 25 (1995).

There is no basis for requiring a different burden of proof to show lack of testamentary capacity. Thus, the trial court did not err in finding the opponents must have shown lack of testamentary capacity by clear, satisfactory, and convincing evidence.

## FINDING TESTAMENTARY CAPACITY

As stated previously, opponents to the will must prove lack of testamentary capacity by clear, satisfactory, and convincing evidence. Where a trial court's finding as to a testator's mental capacity is challenged on appeal, the appellate court is only concerned with whether there is substantial competent evidence to support the trial court's finding and does not compare or weigh the testimony. *Perkins*, 210 Kan. at 626.

In Kansas, it is well settled that in order for the testator to have testamentary capacity, the testator, at the time the will is executed, must know and understand the nature and extent of his or her property and have an intelligent understanding of the disposition he or she desires to make of it, realize who his or her relatives are and who the natural objects of his or her bounty are, and comprehend the nature of the claims of those he or she desires to include and exclude from participation in the property distribution. *In re Estate of Raney*, 247 Kan. 359, 367, 799 P.2d 986 (1990); *In re Estate of Ziegelmeier*, 224 Kan. 617, Syl. ¶ 1, 585 P.2d 974 (1978); *In re Estate of Oliver*, 23 Kan. App. 2d 510, 516, 934 P.2d 144, *rev. denied* 262 Kan. 960 (1997).

"The test of a testamentary capacity is not whether a person has capacity to enter into a complex contract or to engage in intricate business transactions nor is absolute soundness of mind the real test of such capacity. The established rule is that one who is able to understand what property he has, how he wants it to go at his death and who are the natural objects of his bounty is competent to make a will even though he may be feeble in mind and decrepit in body." *Perkins*, 210 Kan. at 626.

The time when the will is made is the time of primary importance in considering if the testator possessed testamentary capacity. Evidence of capacity or lack of capacity before or after that time serves as only an aid in determining whether the testator had capacity at the time the will was executed. *Oliver*, 23 Kan. App. 2d

at 516; *Perkins*, 210 Kan. at 627. The fact the testator suffered from senile dementia is not the determining factor that the person lacked testamentary capacity. *In re Estate of Brown*, 230 Kan. 726, 730, 640 P.2d 1250 (1982); *Oliver*, 23 Kan. App. 2d at 516.

Opponents cite to numerous incidences that occurred both before and after the will was executed as support for their contention that Farr lacked testamentary capacity on the day the will was executed. The events opponents cite to include the following: (1) Two days before the will was executed, as well as on other occasions, Farr was noted as being unable to recall the current season, location of own room, staff names and faces, and that he was in nursing home, and his cognitive ability was noted as severely impaired; (2) less than 2 weeks after the will was executed Farr did not recall that he had gone to his grandson Justin's funeral only 2 days earlier; (3) while at his grandson's funeral, Farr did not recognize Nancy Farr, Marvin's ex-wife after a nearly 32-year marriage, or his grandson Courtney Farr; (4) Farr was reported as being unable to handle medical and financial decisions because of declining cognitive ability; and (5) in the fall of 1996, Farr did not recognize Lottie Farr, Marvin's wife and an employee of Terrace Garden, who had frequent contact with Farr.

The first requirement for testamentary capacity is that the testator know and understand the nature and extent of his or her property and understand the disposition he or she desires to make of it. See *Ziegelmeier*, 224 Kan. 617, Syl. ¶ 1. The testimony at trial was that Farr either recited or acknowledged the majority of his property, recited or acknowledged his sons were Marvin and Howard, and inquired whether this will was the same as his previous will, which, by Brantley's testimony, left all Farr's property to Marvin and Howard and excluded the opponents. The trial court made findings of fact specific as to this evidence. Thus, there is sufficient competent evidence to support this element of testamentary capacity being met.

The second and third requirements for testamentary capacity are that the testator realize who his or her relatives are and who are the natural objects of his or her bounty and comprehend the nature of claims of those included or excluded from property dis-

tribution. See *Ziegelmeier*, 224 Kan. 617, Syl. ¶ 1. The trial court did not specifically find Farr knew his relatives. There was testimony that Farr either recited or acknowledged his two sons Marvin and Howard; however, on the day the will was executed, no mention was made of the opponents, Farr's other heirs at law, or their father, Farr's deceased son Everett. The trial court apparently did not find this fact sufficient to defeat testamentary capacity. The trial court did find that Farr had previously voiced dissatisfaction with the opponents concerning the disposition of property made following his son Everett's death and that Farr had attributed failure to convey the property that passed to opponents following their grandmother's death on the opponents.

Opponents also claim the trial court erred in the weight it gave Dr. Michael Jackson's testimony and in making specific findings regarding that testimony. Both expert and lay testimony is competent on the question of mental capacity. The trier of fact is not obligated to adopt the views and opinions of a physician, no matter how highly qualified, and to reject nonexpert testimony. The court may weigh the testimony of all witnesses on the question and follow the evidence which the court as the trier of fact finds is entitled to the most weight and credence. *In re Estate of Carothers*, 220 Kan. 437, 444, 552 P.2d 1354 (1976).

Opponents contend the trial court erred in finding that Dr. Jackson testified that Farr might have had testamentary capacity on the day the will was executed. Opponents' argument appears to be that the trial court misinterpreted Dr. Jackson's testimony. The trial court found that Dr. Jackson's testimony was that Farr would not have been able to have had a lucid interval, defining lucid interval as "one in which the subject person [is] completely restored to contractual capacity." Opponents contend Dr. Jackson's testimony that Farr could not have had a lucid interval did not speak to his inability to be restored to contractual capacity, but instead that Farr was unable to return to a level of less cognitive decline because dementia is irreversible and progressive.

After reviewing the testimony referred to by the opponents, Dr. Jackson's statement regarding Farr's inability to have a lucid interval did not extend beyond the definition in the trial court's decision.

Additionally, the opponents are missing the most important findings of fact the trial court made regarding Dr. Jackson's testimony. The trial court found:

"Dr. Jackson further admitted on cross examination that he testified previously; that the decedent suffered only 'moderately advanced' dementia, *that perhaps the decedent would have been capable of understanding the nature of his property, the decedent's natural heirs and the distribution that the decedent would like to make*; that the staff and persons who were present in the room at the time of the execution of the Will would be in a better position to observe the decedent; that the disease afflicting the decedent was one which would generally take years to advance; that less than 60 days prior to Dr. Jackson's diagnosis, another doctor in Scott City opined in a medical record that the decedent had only senile dementia with one report clearly showing a diagnosis of 'early senile dementia.' " (Emphasis added.)

In so finding, the trial court either gave greater weight to Dr. Jackson's deposition statements or used the statements in weighing Dr. Jackson's credibility; regardless, however, there was no misinterpretation. It is not this court's duty to reweigh the evidence, only to determine whether there is substantial competent evidence to support the trial court's findings.

Opponents also challenge the trial court's finding that Dr. Jackson's deposition testimony that Farr's dementia was moderately advanced differed from his testimony at trial. Opponents contend the terminology used at trial was different from that used during the deposition and that Dr. Jackson never changed his opinion of Farr's condition.

On direct examination, Dr. Jackson testified that Farr was in a moderate to severe demented state when he started seeing Farr in late 1996. At his deposition, Dr. Jackson testified that Farr's dementia was only moderately advanced, as the trial court's finding of fact states. At the time of trial, Dr. Jackson had reviewed an article submitted by the opponents that contained a seven-level classification system for individuals with cognitive disease. This article was not admitted into evidence at trial. When asked to classify Farr under this classification system, Dr. Jackson testified Farr was in a "severe state of dementia" when he first met Farr in 1996, basing this classification on his records, a couple of visits with Farr, and the fact that Farr was a resident in an intermediate care facility.

The trial judge noted that the terminology had been changed during the case. This distinction in classification, however, did not serve as the sole basis for the trial court's determination that Farr had testamentary capacity and is an accurate statement. Thus, it does not amount to reversible error.

Opponents contend the trial court erred in finding that Dr. Jackson had testified that Farr could have been capable of understanding the nature of his property, his natural heirs, and the distribution he would like to make of his property. On re-direct, opponents attempted to explain Dr. Jackson's deposition statement by claiming Dr. Jackson was referring to Farr's long-term memory in making this statement.

Opponents are attempting to convince this court to reweigh the evidence and find its witnesses and facts more credible. This court's standard of review is to determine only whether substantial competent evidence exists to support the trial court's findings, and it will not reweigh the evidence. See *Perkins*, 210 Kan. at 626.

Opponents also contend the trial court erred in failing to give greater weight to Dr. Jackson's expert testimony. They cite to Dr. Jackson's testimony that a person suffering from dementia can attempt to conceal it and contend the trial court should have given more weight to Dr. Jackson's testimony because of this, relying upon *In re Stafford*, 193 Kan. 120, 392 P.2d 140 (1964). In *In re Stafford*, the court held that medical testimony presents the most clear and satisfactory evidence when a person afflicted with a mental disorder is capable of concealing the disorder from a layman. 193 Kan. at 129.

It is the factfinder's function to determine the weight and credibility of the witnesses. Appellate courts will not pass upon the credibility of witnesses or reweigh conflicting evidence. *Griffin v. Price*, 199 Kan. 649, 651, 433 P.2d 464 (1967); *Stoskopf v. Stoskopf*, 173 Kan. 244, 245, 245 P.2d 1180 (1952); *State v. Timms*, 29 Kan. App. 2d 770, 31 P.3d 323, 327 (2001).

Although Dr. Jackson testified a person suffering from dementia might attempt to conceal the disease, Dr. Jackson did not testify that Farr was successful in doing so. In fact, Dr. Jackson testified at his deposition that those present at the time the will was exe-

cuted and those who observed him daily were in a better position to judge whether Farr was having a good day or a bad day. Those present at the execution of the will included two members of the medical profession and a long-time acquaintance. Dr. Jackson, who saw Farr approximately once every 60 days, did not pursue extensive diagnosis of his dementia. The trial court did not ignore the testimony of Dr. Jackson in rendering its decision, and this court will not pass upon the credibility the trial court placed on Dr. Jackson's testimony. See *Carothers*, 220 Kan. at 444.

Those present at the execution of the will, medical professionals and a long-time acquaintance, believed Farr to have been aware of what was going on when the will was executed. There was evidence that would support that Farr intended to disinherit the opponents. There was also evidence that Farr intended for the 1997 will to be identical to his 1991 will. Opponents had the burden of proving lack of testamentary capacity by clear, satisfactory, and convincing evidence. The trial court's findings of fact supports its conclusion that Farr had testamentary capacity at the time the 1997 will was executed. This court will not reweigh the evidence. See *Perkins*, 210 Kan. at 626.

## UNDUE INFLUENCE

Opponents contend the trial court erred in finding the will was not the product of undue influence. They claim a confidential relationship existed between Farr and Marvin and that suspicious circumstances existed.

The trial court's finding that the will was not the product of undue influence is a negative finding. A negative finding indicates that the party with the burden of proof failed to sustain that burden. *Brown v. Kansas Parole Board*, 262 Kan. 903, Syl. ¶ 1, 943 P.2d 1240 (1997); see *Haneberg*, 270 Kan. at 374 (negative finding where trial court found will opponent failed to establish testator was under undue influence when the will was executed) and *Bennett*, 19 Kan. App. 2d at 166 (negative finding when trial court found there was not a confidential or fiduciary relationship). An appellate court will not disturb a negative finding, "absent proof of an arbitrary disregard of undisputed evidence or some extrinsic

circumstance such as bias, passion, or prejudice." *Haneberg*, 270 Kan. at 374; *Dalmasso v. Dalmasso*, 269 Kan. 752, 758, 9 P.3d 551 (2000).

As this court recently stated in regard to a will contestant's claim of undue influence,

"[i]t is well established in Kansas that once it has been shown that a will has been executed in accordance with the formalities required by the law, the burden in upon the will contestant and he or she must produce evidence to support his position. [Citations omitted.] The will contestant must overcome the burden of proof by clear, satisfactory, and convincing evidence. [Citation omitted.]" *Haneberg*, 270 Kan. at 374.

See also *Bennett*, 19 Kan. App. 2d at 165 (once prima facie case of due execution is shown, contestant has burden to overcome by clear, convincing, and satisfactory evidence).

" 'Power, opportunity, and purpose to exercise undue influence, or possibility, conjecture, surmise and suspicion that undue influence has induced a will, alone cannot authorize the inference that such influence has in fact been exercised.' *In re Estate of Millar*, 167 Kan. 455, 465, 207 P.2d 483 (1949). Undue influence must 'amount to such coercion, compulsion and restraint as to destroy the testator's free agency, and by overcoming his power of resistance, obliges or causes him to adopt the will of another rather than exercise his own.' *In re Estate of Hall*, 165 Kan. 465, 470, 195 P.2d 612 (1948); see *In re Estate of Carothers*, 220 Kan. 437, 443, 552 P.2d 1354 (1976); *Heck v. Archer*, 23 Kan. App. 2d 57, 62, 927 P.2d 495 (1996). 'Human desire, motive and opportunity to exercise such influence will not alone authorize the inference that undue influence was in fact exercised. Neither will suspicion or the possibility of their having induced the making of the will favorable to them be enough to justify a finding of undue influence.' *Klose v. Collins*, 137 Kan. 321, 326, 20 P.2d 494 (1933). Legitimate influence is not improper. Influence obtained by kindness and affection will not be regarded as undue. *Ziegelmeier*, 224 Kan. at 622. Undue influence, in order to overcome a testamentary act, must directly affect the testamentary act itself. *Bennett*, 19 Kan. App. 2d at 163." *Haneberg*, 270 Kan. at 374-75.

In *Haneberg*, 270 Kan. at 375, this court adopted the two-prong test set forth in *Bennett*, for determining whether undue influence was exercised. Under the first prong, the opponents to a will must show that the person who is alleged to have exerted undue influence was in a confidential and fiduciary relationship with the testator. Under the second prong, the opponents must show that the there were "suspicious circumstances" surrounding the making of

the will. *Haneberg*, 270 Kan. at 375; *Bennett*, 19 Kan. App. 2d at 165, 169. If there is a confidential relationship and suspicious circumstances are shown by clear, satisfactory, and convincing evidence, a presumption of undue influence will arise and the burden will shift back to the proponents of the will. *Haneberg*, 270 Kan. at 375; *Brown*, 230 Kan. at 732.

The trial court did not specifically apply this two-prong test in this case, but instead held as follows:

"[T]he burden of proof as to undue influence is on the opponent of the Will and must amount to coercion, compulsion or constraint which destroys the testator's fee [*sic*] agency, and by overcoming his power of resistance obliges him to adopt the Will of another instead of exercising his own, and it must be brought to bear directly on the testamentary act. [*Ziegelmeier*, 224 Kan. at 622] citing [*Carothers*, 220 Kan. at 437]. The opponents of the Will have failed to carry this necessary burden."

The trial court's statement of Kansas law is not incorrect, and neither party contends the trial court applied an erroneous standard in evaluating the undue influence claim. The opponents presented the two-prong test to the trial court in their "Trial Brief in Support of Suzette Hickey and Janell Rangel" and in "Respondent's Proposed Findings of Fact and Conclusions of Law." In the absence of an objection to inadequate findings of fact or conclusion of law, the trial court is presumed to have found all facts necessary to support the judgment. *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998); *Weber v. Tillman*, 259 Kan. 457, 464, 913 P.2d 84 (1996).

Opponents contend that a confidential relationship existed between Farr and Marvin because Marvin was granted power of attorney over Farr, relying upon *Kline v. Orebaugh*, 214 Kan. 207, 519 P.2d 691 (1974), for support. In *Kline*, an action was brought on behalf of aged parents against their son for misappropriation of property in misusing his powers of attorney over his parents. The *Kline* court held that the son had obtained the powers of attorney as a result of his confidential relationship with his parents and that after being granted powers of attorney the son became their agent, thus giving rise to a fiduciary relationship. 214 Kan. at 210.

Kansas appellate courts have been reluctant to adopt an express definition of "confidential relationship" and have repeatedly recognized that whether a fiduciary or confidential relationship exists is a question of fact which must be determined by the facts of the case. See *Haneberg*, 270 Kan. at 375-76; *In re Estate of Brodbeck*, 22 Kan. App. 2d 229, 237, 915 P.2d 145, *rev. denied* 260 Kan. 993 (1996). In *Brodbeck*, the Court of Appeals was faced with a claim of undue influence, with the opponents contending that a beneficiary was in a confidential relationship with the testator. The beneficiary had been granted a durable power of attorney over the testator. The *Brodbeck* court found there was sufficient evidence of the existence of a confidential relationship, but in making this decision the court looked at more than the fact the beneficiary held a durable power of attorney. The additional facts considered included the fact the testator's health was failing, the beneficiary accompanied the testator out of state for medical treatments, and the testator entrusted the beneficiary with her car, which the beneficiary used to run errands for her and drive her to appointments.

We decline to adopt the opponents' contention that a durable power of attorney necessarily places the parties in a confidential relationship. Instead, this should only be considered as a persuasive fact in evaluating whether such a confidential relationship existed.

Regardless of whether there were enough facts to support a finding of a confidential relationship, the opponents also had to prove suspicious circumstances existed in order to give rise to a presumption of undue influence. See *Bennett*, 19 Kan. App. 2d at 169. Kansas courts have also declined to define what constitutes suspicious circumstances, recognizing that what in one case might be suspicious may in another case raise no suspicion. See *Bennett*, 19 Kan. App. 2d 154 (trial court declined to find that certain circumstances are suspicious circumstances as a matter of law, deferring to the factfinder to make the determination in each case). " 'The question of whether suspicious circumstances exist is a question of fact to be determined on a case-by-case basis in the light of the factual background presented.' " *Haneberg*, 270 Kan. at 376 (quoting *Bennett*, 19 Kan. App. 2d at 170).

Opponents set forth numerous circumstances in their brief that they assert are suspicious. The opponents conclude that the existence of the confidential relationship and the presence of these suspicious circumstances shifted the burden of proof to the proponents to prove there was no undue influence and that the proponents failed to sustain their burden. Proponents contend there is no evidence of any undue influence at the execution of Farr's 1991 will, which contained the same provisions as the 1997 will, or at the execution of the 1997 will.

Although some of the facts in this case are somewhat suspicious, the existence of these circumstances is not sufficient to overcome the trial court's negative finding that the will was not the product of undue influence.

Finally, the opponents contend the trial court's finding that the opponents had not seen Farr more than three times each during the last 8 years of Farr's life was not supported by the evidence. Opponents contend the evidence at trial established that Janell and her husband saw Farr at least four times between 1991 and his death and that Suzette had stayed with Farr for a 3-to 4-month period after her grandmother's death and visited Farr on two other occasions before his death.

After reviewing the record on appeal, the opponents' assertions regarding their visits are correct. However, the error is harmless and will not support reversal. See K.S.A. 60-2105.

There is substantial competent evidence to support the trial court's decision. We will not reweigh the evidence.

Affirmed.