Nos. 116,456
117,079

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of EARL O. FIELD.

SYLLABUS BY THE COURT

1.

Whether a will satisfies the statutory formalities is a question of law subject to unlimited appellate review.

2.

When a will is offered for probate, the burden of proof is initially upon the proponent of the will to make a prima facie case showing capacity and due execution of the will.

3.

The statute setting forth the requirements for the proper execution of a will requires that a will be attested by two or more competent witnesses who saw the testator subscribe or heard the testator acknowledge the will and that the witnesses subscribe the will in the testator's presence. K.S.A. 59-606.

4.

Once it has been shown that a will has been executed in accordance with the formalities required by law, the burden shifts to the will contestant and he or she must produce evidence to support his or her position.

5.

A proponent of a will may meet the "due execution" requirement of K.S.A. 59-2224 when nothing on the face of that document raises the suspicion that a competent testator's signature at the end of it and witnessed by two persons is forged. In that event, a will contestant who alleges that the testator's signature on it is forged bears the burden of showing the invalidity of that signature.

6.

Because fraud must be shown by clear and convincing evidence, we review all the evidence to determine whether a rational fact-finder could have found it highly probable that someone other than the testator forged the testator's signature on the purported will or codicil.

7.

When determining whether evidence shows fraud by clear and convincing evidence, we do not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact.

8.

A witness' videotaped testimony may be impeached or discredited by means other than a specific fact witness, such as by the totality of the circumstances.

9.

In cases of circumstantial evidence, a fact-finder who makes a presumption based upon other presumptions engages in inference stacking that does not support a finding of sufficient evidence.

10.

Impermissible inference stacking is not present where different circumstances are used to support separate inferences or where multiple pieces of circumstantial evidence separately support a single inference.

11.

We review a district court's decision to award attorney fees under K.S.A. 59-1504 for an abuse of discretion.

12.

The probate statute permits attorney fees to be awarded to litigants who act in good faith to admit a will to probate, whether successful or not, and to litigants who successfully prevent a will from being probated. K.S.A. 59-1504.

13.

The person who must act in good faith to be allowed attorney fees for trying to admit a will to probate is the client and not his or her attorney.

14.

The proponent of a forged will or codicil, who also participated in the forgery, lacks the good faith necessary to be awarded attorney fees pursuant to K.S.A. 59-1504.

Appeal from Ellis District Court; WILLIAM F. LYLE JR. and JACK L. BURR, judges. Opinion filed February 16, 2018. Affirmed in part and reversed in part.

*Donald F. Hoffman* and *Melvin J. Sauer Jr*., of Dreiling, Bieker & Hoffman LLP, of Hays, for appellant Wanda Oborny.

*Coy M. Martin*, of Bever Dye, LC, of Wichita, and *John Terry Moore*, of John Terry Moore L.C., of Wichita, for appellee Fort Hays State University Foundation.

Before GARDNER, P.J., BUSER and ATCHESON, JJ.

GARDNER, J:  After a nine-day trial to the court at which testimony from over 30 witnesses and over 300 exhibits were admitted, the district court denied Wanda Oborny's attempt to admit a codicil to probate. A codicil is a supplement or postscript to a will. *In re Estate of Heilig*, 211 Kan. 608, 608, 506 P.2d 1147, 1147 (1973). The district court found that the purported codicil had been signed by Oborny, or someone at her behest, instead of by the person who died and whose signature appeared to be on it—Earl O. Field—Oborny's employer. Accordingly, the purported codicil was invalid and Field's previous will governed, directing that Field's estate, worth over $20,000,000, went nearly all to Fort Hays State University (FHSU) instead of one-half to Oborny, one-fourth to Field's attorney, and one-fourth to FHSU, as stated in the purported codicil. A different judge granted Oborny's request for attorney fees. That ruling is the subject of a separate appeal which has been consolidated with the will contest for purposes of argument and decision.

The parties have briefed numerous issues on appeal, but we find it necessary to address only two:  whether clear and convincing evidence supports the district court's ruling that the purported codicil was not signed by Field and whether the district court abused its discretion in awarding attorney fees to Oborny's counsel. As explained below, we affirm the district court's ruling on the signature issue but reverse the award of attorney fees.

FACTUAL BACKGROUND

We provide only a short chronology of key events here and include the bulk of the facts in our review of the sufficiency of the evidence.

4

In January 2009, Field and Winona M. Field (Nonie) executed reciprocal wills. They had no children and bequeathed the vast majority of their estate to FHSU after the death of the surviving spouse. After being married over 70 years, Nonie died in 2009.

In 2010, Field executed a will with provisions similar to those in the 2009 will. It left a life estate for the Burghart family who farmed land for the Fields in western Kansas, provided that the land and associated mineral interest that Nonie and her brother, Carl Brecheisen, had inherited from their father would stay in that family, and provided a monetary gift to the Brecheisens. The residuary estate was to pass to the FHSU Foundation to fund music and athletic scholarships for students attending FHSU, the Fields' alma mater.

Field's 2010 will was prepared by Joe Jeter, Field's long-time attorney. When Field contacted Jeter about his will in 2010, Jeter called a meeting with the President and CEO of the FHSU Foundation because Jeter understood that the 2010 will would be Field's last will and he wanted to be sure the will would work for the Foundation. Field then executed the 2010 will, leaving all to FHSU Foundation except for the specific gifts to the Burgharts and Brecheisens. Field chose Jeter and his brother, Bill Jeter, as co-executors, and Joe kept Field's original 2010 will in Joe's office.

Field met Wanda Oborny when she was working at Farmer's State Bank in Hays, Kansas. She later found employment at the accounting firm Wellbrock and Lutz, Field's accounting firm, and got to know Field when he visited between two and four times each year. Eventually, Field offered Oborny a job as his bookkeeper.

Oborny worked part time for Field beginning in 2008 until his death in 2013. Field became very depressed after Nonie died in 2009, and a witness described him as lost and vulnerable. Field started spending more time with Oborny, who helped Field with errands and brought him food. Field gave Oborny access to numerous bank and investment

accounts he held at various institutions and listed her on several accounts as a joint account holder with the right of survivorship. She had access to his personal and business documents and the ability to sign checks drawn on his accounts. Oborny received hundreds of thousands of dollars of Field's funds before and after his death, and the parties disputed whether Field knowingly condoned or authorized those transactions.

Shortly after January 8, 2013, Field called Oborny and told her that he had fallen. Oborny visited Field at his home while he was recovering and helped him make trips to his office. When Oborny went to work on January 28, 2013, Field was not there. Oborny called Field and he asked her to come to his home. According to Oborny, Field told her that he was "done" and asked her to call his doctor. Oborny drove Field to the hospital where Field was admitted and diagnosed with cancer. On January 31, 2013, Field was admitted to a rest home where he received hospice care.

Field died on February 19, 2013. Oborny was not present when Field died because she had to "run to the bank." That evening, Oborny went to Field's office and testified that she happened to find in Field's desk drawer two typewritten letters dated January 23, 2013, signed by Field: one in an envelope addressed to Oborny and one in an envelope addressed to Jeter. Oborny opened the envelope addressed to her and found a letter instructing that half of Field's estate should be left to her with the remaining half divided equally between Field's attorney and FHSU. But the letters bore no witness signatures.

The next day, on February 20, 2013, Oborny showed Jeter the letter she had found addressed to him. The letter to Jeter bore the same date and was identical to the letter addressed to Oborny, except that on Oborny's letter a personal note to Oborny had been added and the date line had been moved below that note.

Jeter was not happy and told her that the letters were no good to pass property because they lacked witness signatures. Oborny sought a second opinion from her own

6

attorney, Don Hoffman. He told her the same. Soon thereafter, Oborny spoke with her friend, Kathy Little, and Kathy told her husband, Steve Little, that the letters were not valid to pass property because they lacked witness signatures.

On February 25, 2013, several events occurred. Oborny visited the car dealership where Steve was working to have her car serviced. While she was there, Steve called Jeter and told him that he and Kathy had witnessed Field sign the purported codicil at Steve's office on January 22, and had signed it as witnesses. They had not told Oborny because Field had told them he wanted it to be a surprise. Oborny was in contact with Kathy by phone before and after Steve's call to Jeter that day.

The Littles went to Oborny's house that evening and told her the same news they had told Jeter. Oborny testified this was the first she learned of a witnessed document leaving anything to her.

The next day, on February 26, 2013, Oborny went to Field's office to look for the document the Littles said they had witnessed and found the purported codicil, dated January 22, 2013, in a file cabinet along with a copy of Field's 2010 will. (We refer to this crucial document as the "purported codicil" because that is what the parties called it during the trial.) The purported codicil appeared to bear Field's signature and the signatures of two witnesses:  Steve and Kathy Little. Oborny tried to make copies of that document but shredded them, then took the purported codicil to Emprise Bank where she had copies made. She petitioned for probate of the purported codicil that very day.

By the time of trial in 2016, the Littles were dead by murder-suicide. Their testimony was admitted via video depositions. The parties tried the case to the district court, which heard testimony from over 30 witnesses and admitted over 300 exhibits.

7

*The District Court's Findings*

The district court denied Oborny's attempt to admit the purported codicil to probate. The district court found the 2010 will to be valid, thus Field's estate, worth over $20,000,000, went nearly all to FHSU. The district court found that the purported codicil was neither typed nor signed by Field and that Oborny or someone at her behest had signed Field's name on it. It also found that the Fields had a common and contractual estate plan, that probate of the purported codicil was barred by common-law undue influence, by statutory undue influence, by promissory estoppel, and by an oral contract to devise property. Oborny appeals that judgment.

After trial, Oborny moved for attorney fees pursuant to K.S.A. 59-1504. Honorable Jack L. Burr decided that motion, although Honorable William F. Lyle, Jr. had ruled on the merits of the case. Judge Burr granted Oborny's petition for attorney fees in the amount of approximately one million dollars but stayed collection of attorney fees pending appeal. FHSU appeals that judgment.

DID THE DISTRICT COURT ERR IN FINDING THE PURPORTED CODICIL WAS NOT SIGNED BY FIELD?

We first address the district court's ruling that the purported codicil was signed by Oborny, or someone at her behest, instead of by Field. Oborny contends that the district court's finding that the purported codicil was not signed by Field is tantamount to finding that the purported codicil was forged or fraudulent, that FHSU had the burden to show fraud by clear and convincing evidence, and that the evidence presented at trial fails to meet that standard. FHSU counters that the burden remained at all times on Oborny to show the validity of Field's signature on the purported codicil.

8

*Oborny's Burden to Make a Prima Facie Case*

K.S.A. 59-606 sets forth the requirements for a properly executed will or purported codicil. *In re Estate of Leavey*, 41 Kan. App. 2d 423, 427, 202 P.3d 99 (2009); *In re Estate of Milward*, 31 Kan. App. 2d 786, 789-90, 73 P.3d 155 (2003). That statute states in relevant part:

> "Every will . . . shall be in writing, and signed at the end by the party making the will, or by some other person in the presence and by the express direction of the testator. Such will shall be attested and subscribed in the presence of such party by two or more competent witnesses, who saw the testator subscribe or heard the testator acknowledge the will." K.S.A. 59-606.

The rules regarding proper execution and attestation of a will apply with equal force to execution and attestation of codicils. *Humphrey v. Wallace*, 169 Kan. 58, 62, 216 P.2d 781 (1950). Whether a will satisfies the statutory formalities is a question of law subject to unlimited appellate review. *In re Estate of Leavey*, 41 Kan. App. 2d at 426.

The proponent of a testamentary instrument has the burden to make a prima facie case that the testator had capacity and that the instrument was duly executed.

> "When offering a will to probate, the burden of proof is initially upon the proponent to make a prima facie case showing capacity and due execution of the will. See K.S.A. 2001 Supp. 59-2224; *In re Estate of Perkins*, 210 Kan. 619, 624, 504 P.2d 564 (1972); *Amerine v. Amerine, Executor*, 177 Kan. 481, Syl. ¶ 6, 280 P.2d 601 (1955); *In re Estate of Peirano*, 155 Kan. 48, 49, 122 P.2d 772 (1942). It is well established in Kansas that once it has been shown that a will has been executed in accordance with the formalities required by law, the burden is upon the will contestant and he or she must produce evidence to support his or her position. *In re Estate of Haneberg*, 270 Kan. 365, 374, 14 P.3d 1088 (2000)." *In re Estate of Farr*, 274 Kan. 51, 58-59, 49 P.3d 415 (2002).

Oborny argues that the purported codicil complied with the statutory formalities because it was typewritten, was signed at the end by Field whose testamentary capacity is not challenged, and was signed by two witnesses whose capacity to testify is not challenged and who testified that they saw Field sign it.

Field's testamentary capacity on the dates of the purported codicil was established at trial by several witnesses. Dr. Randy Cook, Fields' physician who had treated him since 1998, characterized Fields as "[p]robably the brightest, sharpest individual I had had in my practice for age ever." The Admissions Coordinator at the rest home testified that he had administered a Minimal Data Summary on Field on or about January 31, 2013, which showed Field had no cognitive problems, and Field had no delirium problems. Field's broker sold bonds to him just five days before the date on the purported codicil and said she had no concerns about his competency then or at any time. No evidence tends to show that Field lacked the necessary testamentary capacity on January 22, the date of the purported codicil.

The purported codicil appears to bear the signatures of Steve Little, Kathy Little, and Earl Field at the end of the document. Steve and Kathy signed affidavits stating that they witnessed Field sign the purported codicil. At trial, via their video depositions, the Littles testified consistently with each other that they watched Field sign the purported codicil and then they signed it as witnesses in Steve's office at Field's request. Expert testimony showed that three different pens were used to execute the purported codicil, which is consistent with the Littles' testimony.

Jeter, Field's attorney, testified that he was familiar with Field's signature and that the signature on the purported codicil appeared to be Field's. A witness need not be a handwriting expert to offer testimony on the validity of a signature. See *Amerine v. Amerine, Executor*, 177 Kan. 481, 486, 280 P.2d 601 (1955). Oborny's handwriting

expert also testified that it was probable that the signature on the purported codicil was Field's.

The purported codicil on its face thus appears to comply with the requirements of K.S.A. 59-606. See K.S.A. 59-2224; *In re Estate of Perkins*, 210 Kan. 619, 624-25, 504 P.2d 564 (1972); *Amerine*, 177 Kan. 481, Syl. ¶ 6; *In re Estate of Peirano*, 155 Kan. 48, 49, 122 P.2d 772 (1942). Oborny met her burden to make a prima facie showing that the purported codicil was a valid testamentary instrument because the evidence noted above from Dr. Cook, Steve Little, Kathy Little, Joe Jeter, and Oborny's handwriting expert showed both Field's capacity and due execution of the purported codicil.

We note FHSU's argument that Oborny did not meet her burden to show "due execution" of that document because she failed to show the genuineness of Field's signature on it. We acknowledge that K.S.A. 59-2224, which governs the probate of a will, could reasonably be interpreted in that manner because it states that the court "may admit proof of the handwriting of the testator" to prove the "due execution of the will."

> "On the hearing of a petition for the probate of a will . . . the testimony of at least two of the subscribing witnesses shall be taken in person, by affidavit or by deposition. [If the court does not] waive the requirement of such testimony . . . the court may admit the testimony of other witnesses to prove the capacity of the testator . . . and the due execution of the will . . . and, as evidence of such execution, may admit proof of the handwriting of the testator . . . and of the subscribing witnesses." K.S.A. 59-2224.

But the Kansas Supreme Court has interpreted this statute to mean that once the proponent shows a will has been executed in accordance with the formalities required by law, the burden shifts to the will contestant to produce evidence to support his or her position. *In re Estate of Farr*, 274 Kan. at 59. We think that here, where nothing on the face of the document raises the suspicion that a signature on it is forged, the better practice is to shift to the will contestant the burden of showing the invalidity of a

competent testator's signature at the end of a testamentary document witnessed by two persons. The formalities required by law have been met.

Shifting the burden to the will contestant at that point is consistent with the shifting burden in undue influence cases. In those cases, after the proponent has proffered a prima facie case for validity of a testamentary document, the burden shifts to the will contestant to show the requisite relationship and suspicious circumstances necessary to create a presumption of undue influence. *In re Estate of Moore*, 53 Kan. App. 2d 667, 682, 390 P.3d 551 (2017).

Shifting the burden is also consistent with the method and burden of proof, generally, in fraud cases. It is a "long-established rule in this state that one who asserts fraud has the burden of proving it by a preponderance of the evidence; that such evidence should be clear, convincing and satisfactory; and it does not devolve upon the party charged with committing the fraud to prove that the transaction was honest and bona fide. [Citations omitted.]" *Wyatt v. Taylor*, 166 Kan. 453, 457, 201 P.2d 647 (1949). Thus, in *Wyatt*, where the owner of a building sought to cancel a lease because her signature on that lease had been obtained by fraud, the burden was upon the one claiming fraud to prove it by a clear and convincing preponderance of the evidence. See also *McMurray v. Crawford*, 3 Kan. App. 2d 329, Syl. ¶ 2, 594 P.2d 1109 (1979) (applying the rule that where execution of an instrument is denied, the presumption of execution that arises from a notary's certificate of acknowledgement may be overcome only by clear and convincing evidence; the party against whom the presumption operates has the burden of proof of nonexecution of the instrument). See *In re B.D.-Y.*, 286 Kan. 686, 695, 187 P.3d 594 (2008) (quoting *Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 [Tenn. App. 2001]) ("'The determinative question under this standard of review is whether or not the plaintiffs [who seek to set aside the deed] have carried the burden to establish that it is "highly probable" that the two deeds . . . are forgeries.'"). FHSU thus had the burden to

establish that it was "highly probable" that Field's signature on the purported codicil was a forgery. See *In re Estate of Farr*, 274 Kan. at 59.

### *FHSU's Burden to Show Invalidity*

Fraud is never presumed and must be proved by clear and convincing evidence. *Alires v. McGehee*, 277 Kan. 398, Syl.¶¶ 1-2, 85 P.3d 1191 (2004). Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 2. Clear and convincing evidence is "evidence which shows that the truth of the facts asserted is highly probable." 286 Kan. 696, Syl. ¶ 3. "When an appellate court reviews a trial court's determination which is required to be based upon clear and convincing evidence, it considers whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found the determination to be highly probable." 286 Kan. at 705. The Kansas Supreme Court recognized that "[a]lthough this case involves a CINC determination, we see no valid reason why the appellate standard of review articulated here should not also apply to all cases requiring the factfinder to make a determination based upon clear and convincing evidence." 286 Kan. at 706. Fraud is such a case.

The district court did not expressly find fraud but implicitly did so by finding that Oborny or someone other than Field, at Oborny's behest, signed the purported codicil instead of Field. "[F]orgeries are a species of fraud." 37 C.J.S., Forgery § 1. See Black's Law Dictionary 766 (10th ed. 2014) (defining forgery as "1. The act of fraudulently making a false document or altering a real one to be used as if genuine."). We thus determine whether after review of all the evidence, viewed in the light most favorable to the party who prevailed below, we are convinced that a rational fact-finder could have found it highly probable that Oborny or someone other than Field, at Oborny's behest, signed the purported codicil instead of Field.

13

In making that determination, we do not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). We steadfastly apply that rule here, despite Oborny's tacit yet repeated requests that we engage in those very tasks.

*Does Clear and Convincing Evidence Show that Field Did Not Sign the Purported Codicil?*

Oborny asserts that the evidence before the district court did not amount to clear and convincing evidence showing the purported codicil was not signed by Field. The record does include some circumstantial evidence supporting her position. Lay testimony showed that Field was an astute businessman, that Field had the ability to prepare the purported codicil without help, that Field regularly changed his wills and had done so at least seven times from 1994 to 2010, that the signature on the purported codicil appeared to be Field's, that Field said Oborny was like a daughter to him, that Field had given Oborny hundreds of thousands of dollars while he was alive, and that Field made some statements in his later years that could reasonably be construed as indicating some degree of disenchantment with FHSU.

Oborny heavily relies on her handwriting expert's opinion that it was probable that Field signed the purported codicil and on the videotaped depositions of the Littles, who testified that they witnessed the purported codicil at Field's request and saw Field sign that document. We carefully examine the testimony of these crucial witnesses below.

14

*Forensic Evidence*

Extensive testimony was given by forensic experts called by both sides who offered opposing conclusions on the validity of Field's signature on the purported codicil, among other matters.

*FHSU's Experts*

Jimmy Smith and James Blanco testified that the signature on the purported codicil was not made by Field. Their opinions were based on the peculiarities of that document, the signature on the purported codicil as compared to Field's known signatures, and the formatting of that document.

*The Peculiarities of the Purported Codicil*

The Adler typewriter that had been used to type the purported codicil and the unwitnessed letters was not the same typewriter Field had used to type letters and checks when he was still typing. Field had used a newer electronic typewriter that had a distinctly different "1" than did the Adler typewriter.

The second half of the text of the January 23, 2013, letters is significantly darker than the first half, likely evidencing that the ribbon had been changed mid-letter. A letter typed on January 22, before the January 23rd ribbon change, should thus be lighter. But the text of the January 22 purported codicil is dark throughout, suggesting that it was actually typed after the ribbon change on January 23. The variation within the text of the January 23rd unwitnessed letters suggests that those letters, despite the date they bear, were drafted before the purported codicil dated January 22, 2013.

Smith testified that the purported codicil had been typed with the same typewriter ribbon except that the "cc, carbon copy in drawer" notation at the bottom had been typed after a ribbon change. He also noted that the purported codicil and the shredded photocopy of that document both contained the same corrections and errors, such as "tqalked" instead of "talked" and "estaste" instead of estate, and that it would be impossible to type two separate letters with all the exact misspelled words or any type overs. Smith stated that the signatures and misspelled words on the January 22, 2013, purported codicil exactly matched those on the shredded photocopy of that document which bore Field's signature but had no date or witness signatures. He opined that the shredded document was photocopied before the Littles' signatures, the dates, and the "cc" notation had been added.

*The Signature Itself*

Smith testified that a letter in Field's signature on the January 23, 2013, letter had been retraced and that it is unusual for people to retrace letters when signing their names. He also testified that it was impossible for people to make identical signatures because of natural variations, yet Field's signatures on the purported codicil and on the shredded copy of the purported codicil, which had no witness signatures, were identical.

Other signatures by Field shortly before he died show Field was having difficulty signing his name, but Field's signature on the purported codicil is easily read and shows fluidity. FHSU's expert determined that Field was not capable in January of 2013 of signing with the fluidity shown in the purported codicil's signature. FHSU's expert noted that Field always crossed the F in his name left to right, but the F in the purported codicil was crossed from right to left. He testified that the January 22, 2013, purported codicil and the January 23, 2013 unwitnessed letters had been typed on the same typewriter. Blanco found 10 material differences between Field's known signatures and the signature on the purported codicil, which were "very compelling" evidence that the signature on the

16

purported codicil was not Field's. Blanco eliminated Field as the writer of the signature on the purported codicil. Both experts agreed that based on variances from known signatures, the signature on the purported codicil had not been made by Field.

### *The Formatting of the Purported Codicil*

Smith noted that the formatting of the purported codicil and the location of Field's signature was inconsistent with documents known to have been prepared by Field. Specifically, the punctuation, construction, salutation, margins, spacing between paragraphs, closing, date placement, and signature location in the purported codicil differ from Field's historic structure and formatting of his letters. For example, Field routinely put the date directly underneath his letterhead at the top of his correspondence and not at the end near his signature where it appears on the purported codicil, and Field signed his name at the middle or right side of letters and not at the far left where his signature was placed on the purported codicil.

### *Oborny's Expert*

David Parrett opined that it is probable that Field did sign the purported codicil. But in the parlance of handwriting experts, "probable" is a relatively weak standard. Parrett, unlike FHSU's experts, compared Field's original ink signatures on his 2010 will to the signature on the purported codicil. But Parrett did not address the apparent differences in formatting.

Oborny contends that her expert witness was more credible than the other expert witnesses or that the district court should have given her expert more weight than it gave FHSU's experts because the latter did not examine original ink signatures and examined fewer signature samples in formulating their opinions. But the record does not support Oborny's assertion that FHSU's handwriting experts examined fewer samples than did her

17

expert. Instead, the record shows that FHSU's handwriting experts examined the same signatures Oborny's expert examined and then chose some of the signatures to demonstrate their findings.

Oborny also attacks the qualifications of FHSU's experts, pointing to the low quality reconstruction on which Smith relied, Smith's lack of recent attendance at handwriting seminars, and his failure to use modern technology. She details Blanco's recent professional problems which led him to resign from the American Academy of Forensic Sciences. But Oborny did not object below to the qualifications of FHSU's experts and does not argue on appeal that the district court erred in admitting their opinions. Instead, she asks us to give her expert's opinions greater weight than FHSU's experts' opinions. But experts from both sides gave legally sufficient testimony on the question of the validity of Field's signature on the purported codicil.

While we acknowledge the conflicting testimony of the experts, we are prohibited from reweighing the evidence or offering our own credibility assessment.

> "[O]ur trial judges are frequently presented with competing expert opinion testimony, requiring the jurists to assess the credibility of the witnesses and weigh the conflicting evidence to reach a decision that comports with one opinion and contradicts the other opinion. We endow our district courts with the authority and responsibility to make that choice, *i.e.*, to trust one opinion over another. See *Hill*, 290 Kan. at 370-71 (to extent trial judge trusted opinions originating from Larned team more than those from defense, 'he was entitled to do so')."
> *State v. Stewart*, 306 Kan. 237, 259, 393 P.3d 1031 (2017).

The district court had the opportunity to see and evaluate the expert witnesses and could reasonably decide to give greater credit or weight to FHSU's experts than to Oborny's.

18

*Steve and Kathy Littles' Testimony*

Oborny next contends that no fact witness attacked or impeached the Littles' clear, consistent, and "nonrepudiative" video testimony. But the district court found the Littles' testimony not credible. Had it credited their testimony, it would necessarily have found that Field did in fact sign the purported codicil in their presence, as they both testified. We find, based on the evidence summarized below, that the Littles' testimony was impeached or cast into doubt by means other than a specific fact witness—by the totality of the circumstances.

Steve Little testified via video deposition that he worked at an auto dealership. He had sold Field a car in 2011 after Oborny had introduced them, and that was his sole connection to Field. Field had visited the dealership occasionally—perhaps five times— to ask questions about his car. Steve testified that on January 22, 2013, in the early afternoon, Field came to the auto dealership where Steve worked to ask about how to work the heater in his car. Steve went outside, sat in Field's car with Field, and discussed the controls for a while. Eventually, his wife, Kathy, happened to arrive at the dealership and Field asked if the two of them would be willing to witness his signature on his will. The three of them then went to Steve's office, read the purported codicil, and signed it. Kathy added a date for the witness signatures. All of the typewritten text on the purported codicil was present when Steve signed it, including the date and a carbon copy designation. It was obvious to Steve that Field wanted to change his estate plan, but Field did not tell Steve why he was doing so. Field instructed Steve and Kathy not to tell Oborny about the purported codicil because Field wanted to surprise her.

Kathy also testified by video deposition at trial. Her deposition testimony was largely consistent with Steve's version of events concerning the execution of the purported codicil on January 22, 2013. Oborny, Kathy, and Steve had a telephone conference that lasted nearly an hour on the day Field died, but Kathy could not recall

19

what the phone call was about. She denied memory of any conversation with Oborny about Field's estate plan, but Steve confirmed that Oborny had told Kathy about Oborny's conversation in which Jeter had told Oborny the unwitnessed letters were no good because they were not witnessed. Steve testified that Kathy had told him to call Jeter because she knew that Jeter had told Oborny that the letter she had presented earlier lacked witness signatures. And the telephone records show that before Oborny met with her attorney to ask about the unwitnessed letters, Kathy had sent Oborny a text message wishing her "good luck."

On February 25, 2013, Steve called Jeter and told him that he and Kathy had witnessed the purported codicil. Steve was surprised that Jeter had no knowledge of that document. Steve claims that he did not speak with Oborny until after he called Jeter on the 25th. But Oborny admitted that she took her car into Steve's place of business to be serviced on the 25th, and a comparison of the service record for her car and the telephone records for Steve's phone shows that Oborny had her car serviced at the very same time Steve called Jeter. Oborny also called Kathy a few hours after she called the dealership. These facts provide a basis for a reasonable factfinder to doubt the Littles' testimony.

Oborny also contends that the district court drew impermissible inferences from the irrelevant fact that the Littles died in a murder-suicide after being investigated by the Federal Bureau of Investigation (FBI).

The autopsy report admitted at trial shows Steve died on August 20, 2015. While in their car, he shot Kathy in the chest and killed her then turned the gun on himself. Officer Jeff Ridgway, an investigator with the Hays Police Department, testified that before the Littles' bodies were discovered and during the course of his missing persons' investigation related to them, he learned that two FBI special agents had been at the Littles' house the morning of August 20. He spoke with the FBI agents but because the matter related to a grand jury proceeding, the special agents would not tell him the nature

20

of their investigation. Ridgway also searched the Littles' house on August 21 and the Littless' son showed him a federal subpoena for Steve Little to appear before a grand jury on September 15, 2015. That subpoena was similar to the grand jury subpoena issued to Lynda Burghart. The coroner's report states that the FBI had served the Littles with a warrant to appear before a grand jury in mid-September 2015. And the record shows that in July 2015 the same FBI agents had inspected the shredded documents that were later admitted in this case. The Littles' bodies were found on the evening of August 21.

Oborny does not argue on appeal that the evidence of the Littles' murder-suicide on the very day they had received a visit from the FBI was improperly admitted at trial. Oborny does assert that the district court erred in admitting Ridgway's testimony and report. But she makes no effort to show why admission of that testimony was in error and cites no authority for that conclusion. An issue not briefed by an appellant is deemed waived or abandoned. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016). And points raised incidentally in a brief without citation to pertinent authority are deemed abandoned. *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015); *State v. Murray,* 302 Kan. 478, 486, 353 P.3d 1158 (2015). Such is the case here.

Instead, Oborny contends that the district court erred in stacking two inferences to impeach the Littles' testimony: (1) that the Littles died because of their involvement in Field's estate; and (2) that the purported codicil is therefore a forgery. In cases of circumstantial evidence such as this one, a fact-finder who makes a presumption based upon other presumptions engages in inference stacking that does not support a finding of sufficient evidence. See *State v. Richardson*, 289 Kan. 118, 130, 209 P.3d 696 (2009). But the record summarized above shows the foundational facts supporting a reasonable inference that the grand jury subpoena left with the Littles on the morning of their deaths did, in fact, relate to the facts underlying this case. Oborny's assertion of inference stacking is merely speculative, as the district court could have discredited the Littles' testimony for other reasons, including the impeachment of Steve's testimony that he had

21

not spoken with Oborny on the day Steve called Jeter to tell him he and his wife had witnessed the purported codicil, and the contradiction between Steve and Kathy's testimony as to whether Oborny had told Kathy about the attorney having said the letters were no good due to lack of witnesses.

Abundant evidence other than the time and manner of the Littles' deaths supports the conclusion that the purported codicil bears Field's forged signature. "Impermissible inference stacking is not present where different circumstances are used to support separate inferences or where multiple pieces of circumstantial evidence separately support a single inference." *State v. Banks*, 306 Kan. 854, Syl. ¶ 3, 397 P.3d 1195 (2017). Here, the district court relied on multiple circumstances to support its conclusion of forgery, and those circumstances were proved, rather than presumed from other circumstances. Cf. *State v. Netherland*, 305 Kan. 167, 179, 379 P.3d 1117 (2016) (multiple pieces of circumstantial evidence supporting a single inference does not constitute inference stacking). We have noted some of that evidence above. We summarize more evidence below supporting the conclusion of forgery, but we find no impermissible inference stacking.

*Oborny's Testimony*

The district court impliedly found that Oborny lacked credibility. The court specifically noted Oborny's termination from her previous job for misuse of funds, her inconsistent testimony that she had no knowledge of the purported codicil despite the shredded "dictated" forerunner of the purported codicil in her handwriting, her friendship with and numerous telephone calls to and from Kathy Little both before and after the alleged signing of the purported codicil in Steve's office, and her inconsistent testimony about her contact with Steve Little on the day Steve called Jeter to tell him he and Kathy had witnessed the purported codicil.

22

The record confirms that Oborny's testimony was repeatedly inconsistent. Oborny first stated that she had no idea that Field intended to include her in his estate plan until the Littles told her so on February 25, 2013. But she later testified that on January 17 or 18, 2013, Field had asked her to take dictation of a letter to Jeter stating that half of Field's estate should be left to Oborny. Oborny said she initially left that letter on the corner of her desk for Field but shredded it the next day because she did not think Field needed it. The content of the shredded letter in her handwriting was nearly identical to the substance of the two typewritten, unwitnessed letters to Oborny and Jeter dated January 23.

Oborny testified in her deposition that both Jeter and her own attorney had told her that the January 23rd letter was no good because it lacked witness signatures. But at trial, she denied that either attorney had told her the reason why the letter was no good.

Oborny first stated that she took her car to Steve's place of employment to be serviced in the morning of February 25 and left without speaking with Steve. But the service records for her vehicle establish that she was there not only in the afternoon but also at the very same time Little placed a call to Jeter, as shown by telephone records. This was the call in which Steve told Jeter he and Kathy had witnessed the purported codicil.

Oborny tried to make copies of the purported codicil on February 26 at Field's office but for some unstated reason was unsuccessful so she shredded three of them. Shredded copies of the purported codicil were recovered from a shredder bin located near Oborny's desk and were reconstructed by order of the court. Oborny testified at her deposition that she shredded all copies of the purported codicil, including the one bearing Field's signature. But at trial, she testified that she shredded all copies of the purported codicil except the one bearing Field's signature.

23

A shredded copy of the typed purported codicil showed Field's signature but somehow lacked the witness signatures and dates that were present on the purported codicil that Oborny says she was trying to copy at the time. Oborny could not explain why the signatures were absent from the reconstructed document. Experts testified that the witness signatures of Steve and Kathy Little, the date of January 22, 2013, and the "cc:" designation which are on the purported codicil were added after the photocopy was made. Even if one assumes that the shredded photocopy of the purported codicil bears a copy of Field's genuine signature, the very existence of that document refutes the Littles' testimony that Field signed the purported codicil in their presence immediately before they signed it as witnesses.

A handwritten draft of the purported codicil was also found shredded and was then reconstructed. Oborny testified that this was the document she had written from Field's dictation on January 17 or January 18, 2013. Yet she previously stated she had no knowledge of any witnessed document until February 25 when the Littles told her about it by saying Field told them he wanted it to be a surprise for Oborny. Had Field dictated a document to Oborny in January giving her half his estate, he would not have expected Oborny to be surprised to learn of that same fact in February. And Field's office assistant from 2000-2008 testified that Field had never asked her to take any dictation.

Experts stated that the typewriter ribbon had been changed in the midst of the letters dated on January 23, as shown by the lighter text at the beginning of that letter and the darker text beginning in its fourth paragraph. Oborny's testimony about Field's typewriter was inconsistent. Oborny first said that she did not modify Field's Adler typewriter. But she later said that she had changed the ribbon on it because Field had told her on January 22, 2013, to do so. At trial, Oborny could not remember any specific instances of Field having prepared documents in January 2013, but she later remembered that Field was typing on January 22, 2013. This contradicts her deposition testimony that

24

she did not recall Field typing anything on January 22 or 23, 2013, and that Field was not typing anymore by the end of 2012.

Orborny's theory is that Field left the building 59 minutes after she did on January 22, 2013, giving Field time to type the post-ribbon change carbon copy designation and "1-22-2013" date on the purported codicil before driving out to Lewis Ford later that afternoon. He was also at his office for about 30 minutes on January 23, 2013, giving him sufficient time that day to sign and copy the unwitnessed letter to Jeter, type the two-sentence note at the end of Oborny's copy of the unwitnessed letter, then type the "1/23/2013" date on Oborny's copy and on Jeter's original. But witnesses testified that Field was no longer typing, and Oborny's speculation to the contrary does not refute the clear picture of forgery which was consistently painted by those who knew Field and who knew Oborny.

*The Burgharts*

The Burgharts grew up in the same town as the Fields and farmed the Fields' land since 1980. They became friends, shared meals, and helped the Fields move out of their winter home in Arizona and back to Kansas. Field asked Vincent Burghart to move onto his land when Field bought additional land which had an old homestead on it, and Vincent did so. He remained in that home at the time of trial. Field had included a life estate for Vincent in his wills since 1994 and had included Timothy Burghart in that life estate in his 2003 and subsequent wills.

Field had explained to Lynda Burghart in a 2005 e-mail why he and Nonie were leaving their estate to FHSU:

"Our concer[n] and probably the reason of leaving the bulk of the estate to the College is to preserve our name—or legacy—if it can be called that—and to be remembered in the

25

years to come. Since we have no children it was our thinking that this would preserve our name in years to come. No doubt things would have been different had we had children. They—the College—can only spend a portion of the income from the estate each year and the balance carried forward and thus to be increased each year."

Lynda called the Fields almost daily and corresponded with them frequently by letter and e-mail. Lynda visited Nonie at the hospital before she died. Nonie told her to make sure that Field fired Oborny, his bookkeeper, because Oborny was after Field's money. Lynda recalled an argument between Nonie and Field in which Nonie asked Field to fire Oborny because she was after money. Field responded by saying that Oborny meant nothing to him, that she was only his secretary, and that he paid her well. The Burgharts helped Field cope with losing Nonie.

In Field's later years, Field's letters and emails stopped because Field was having difficulty typing, but Lynda and Tim remained in constant contact by telephone and continued to visit Field in Hays.

*Dr. Hammond*

Dr. Edward Hammond, then President of FHSU, visited Field in the nursing home at Field's request on February 9, 2013, *after* the date of the purported codicil and when Oborny was not present. Field told him that Joe Jeter had his will, and he wanted Hammond's word that he would carry the will out specifically the way it was intended. Field said he wanted his fund at FHSU to be perpetual, and Hammond testified that was the way his will was structured. Field wanted to make sure that FHSU was not going to use Field's money solely for athletic scholarships but also for music scholarships, as Nonie wished. Field told him that FHSU was going to receive significantly more money than previously estimated, and Field made no mention of letters or envelopes such as those Oborny said she had found and never mentioned his intent to leave anything to Oborny. Field never mentioned that he had changed his mind or that he wanted to leave

26

some of his estate to Jeter or Oborny. Field never told him that he had decided to disinherit the Burgharts or the Brecheisens, and Hammond volunteered that Field would never do that.

*Ralph Howerton*

Field's accountant, Ralph Howerton, testified that Field was a meticulous, parsimonious, and tax-adverse person who had used investment strategies to avoid income tax, had the bulk of his investments in tax-free municipal bonds, and had disputed property tax valuations. Field's stated tax philosophy was to pay the taxes he owed but not a penny more. Field had told him there was no point in talking about estate planning because he had it all taken care of and that everything was going to FHSU, and Field knew that would not be a taxable event. Field's habit was to make deductible charitable gifts to institutions and not taxable gifts to individuals. Field structured his gifting activity during his life to secure a tax advantage. Field never indicated to him that he wanted to gift or leave money to Oborny or Jeter or anyone but FHSU. He agreed that Field would be "rolling over in his grave" if he knew his estate would have to pay millions in estate tax.

*Tim Givan*

The Special Administrator of Field's estate, Tim Givan, stated that Field's estate incurred no federal or state estate tax under the 2010 will. But if Field's property passed via the purported codicil, his estate would incur around $4.4 million in estate tax. This is because 75% of Field's estate would go to Oborny and Jeter instead of to a charitable or educational institution. Givan said from outward appearances, Field was "tax adverse" as shown by the fact that the bulk of his assets were invested in tax-advantaged vehicles such as municipal bonds.

*Bill Talbott*

Field's friend Bill Talbott officed across the hall from Field at the downtown Emprise Bank and saw him often. Field told him that this estate was going to FHSU. He thought it would be out of character for Field to disinherit the Burgharts or to leave a taxable estate.

*Ralph Engel*

Field's longtime friend Ralph Engel testified that Field lost interest in FHSU, that Field told FHSU that it needed to wait for him to die before FHSU could have his money, and that Field had commented that all FHSU wanted was his money. But Field had told him his estate plan left everything to FHSU and he never changed that plan to Engel's knowledge. Engel never heard Field say that he intended to disinherit FHSU, and he confirmed that Field would be "rolling over in his grave" if he knew his estate would have to pay millions in estate tax.

*Joe Jeter*

The Fields had used Jeter's firm since the 1960's, had always used that firm for their estate planning, and had never typed their own wills. The Jeter firm had drafted at least 16 testamentary instruments for the Fields. The Fields' testamentary commitment to FHSU Foundation had not changed since 1987 and was included in their wills executed in 1994, 1996, 1998, 2000, 2003, 2005, 2009, and 2010.

In 2009, before Nonie died, Jeter prepared reciprocal but separate wills for Field and Nonie. In 2010, before Field executed his 2010 will, Field told Jeter that his estate was going to be a mess and that he would need Oborny's help and that Oborny should be paid well. Field also told Jeter that he had already made inter vivos gifts to Oborny and

that she was like a daughter to him. Field did not disclose the nature of the gifts and Jeter did not ask. Field never mentioned to him or anyone in his office that he wanted to leave something to Oborny as part of his estate.

*Meryl Mahoney*

Meryl Mahoney was Oborny's supervisor when she worked at Farmers State Bank in Hays before Fields hired her. Mahoney testified via his deposition that Oborny had written herself checks out of a bank custodial account and had been given the option of quitting or being fired for misappropriation of funds. Oborny conceded that her termination from that bank was related to her bouncing checks and misappropriating funds.

*Jolene Burd*

Jolene Burd, one of Oborny's high school classmates, testified that in 1991 Oborny had volunteered to serve as treasurer for a class reunion event and collected all the money for the event. Oborny took money from the class account for her personal use. When Burd tried to recover the funds, Oborny admitted she had taken class funds and ultimately paid the money back over time.

*Janet Klaus*

Janet Klaus worked for Field as his secretary from 2000-2008 when Field hired Oborny. She testified that from 2000 to 2008, Field never asked her to take dictation or type a letter for him. Yet after the purported codicil in Oborny's handwriting was discovered in her shredder, Oborny said that Field regularly asked her to take dictation.

Other witnesses testified to Field's reputation for honesty and opined that Field would never have knowingly employed a dishonest employee and likely would not have hired Oborny had he known she had previously been terminated from employment for misappropriating funds.

*Conclusion*

The record contains much other evidence which we have reviewed, but we need not detail it any further. We are fully convinced that a rational fact-finder could have found it highly probable that Oborny or someone other than Field, at Oborny's behest, signed the purported codicil instead of Field.

The terms of the purported codicil contradict Field's longtime estate plan. No evidence showed that Field ever expressed any negative feelings about the Burgharts or Brecheisens or that he intended to disinherit either of them, as the purported codicil would do. Instead, testimony showed that Field would not have wanted to disinherit the Burgharts or the Brecheisens, would not have subjected his estate to an estate tax, and would have wanted his name to be perpetually remembered at FHSU.

It is significant that Field, likely unbeknownst to Oborny, told FHSU's President *after* the date of the unwitnessed letters and the purported codicil that his attorney had his will, and that FHSU was going to receive significantly more money, not less money, than previously estimated. No evidence showed that Field ever mentioned wanting to leave any of his estate to Oborny or to Jeter.

Field had never used a type of document similar to the purported codicil to express his testamentary desires. Field had many previous wills, had always used attorneys to draft them, and had never drafted a will by his own hand. Due to his advanced age and medical problems, Field was not capable of signing his name in 2013 with the fluidity

30

shown on the purported codicil's signature. Field had stopped typing due to his advanced age, but the purported codicil was typed, and the formatting of the purported codicil is different from documents known to have been prepared by Field.

The shredded copy of the purported codicil lacked witness signatures and dates, but was otherwise identical, even including its typographical errors, to the purported codicil itself. Field's signature was identical on both—as though it had been photocopied. But Field could not have signed that shredded document, even according to Oborny's theory, because Field did not sign the purported codicil (from which the shredded document was supposedly photocopied) until the instant the Littles also signed and dated it. Any copy of the purported codicil that bore Field's signature should also have had the Littles' signatures on it.

The January 23, 2013, unwitnessed letter addressed to Jeter inexplicably made no mention of the previous day's witnessed purported codicil. Had Field changed his will via the purported codicil on January 1, 2013, he would have mentioned that fact in his unwitnessed letter to Jeter on January 23, 2013, so Jeter would know he had changed it.

Oborny's testimony was often inconsistent. She had a history of taking other persons' money. Oborny was in nearly constant contact with Kathy Little via telephone calls or texts. She had access to Field's office and the opportunity to create the purported codicil. Abundant evidence was admitted to suggest that Oborny took advantage of Field after Nonie died by using his money for her personal use, but we do not need to analyze that evidence for purposes of this case.

The suspicious circumstances surrounding the execution of the purported codicil, the multiple contradictions in Oborny's testimony, the impeachment of the Littles' testimony, the shredded documents themselves, and the compelling nature of the forensic evidence, in conjunction with the other evidence, show that it is highly probable that the

purported codicil was not signed by Field. Based on all the evidence of record, we find clear and convincing evidence supporting the district court's conclusion that Oborny, or someone other than Field, at Oborny's behest, signed the purported codicil instead of Field. The 2010 will and not the purported codicil is thus the last valid testamentary instrument made by Earl Field. We find it unnecessary to address any of the other legal theories relied on by the district court for not admitting the purported codicil to probate.

## DID THE DISTRICT COURT ABUSE ITS DISCRETION IN AWARDING ATTORNEY FEES TO OBORNY?

After the trial, Oborny moved for attorney fees in the amount of approximately $1,000,000. Her motion was granted by a different judge than the judge who had tried the will contest. FHSU now appeals that award, contending that the district court erred in construing K.S.A. 59-1504 to authorize payment of Oborny's attorney fees and expenses.

*The Governing Law*

The relevant text of K.S.A. 59-1504 provides:

"Whenever any person named in a will or purported codicil defends it, or prosecutes any proceedings in good faith and with just cause, for the purpose of having it admitted to probate, whether successful or not, or if any person successfully opposes the probate of any will or purported codicil, such person shall be allowed out of the estate . . . compensation for such person's services and those of his or her attorneys as shall be just and proper."

Some Kansas caselaw suggests that the party seeking an award of attorney fees under this statute must be successful in the action. *In re Estate of Gardiner*, 29 Kan. App. 2d 158, 163, 23 P.3d 902 (2001); *In re Estate of Mildrexter*, 25 Kan. App. 2d 834, 838-39, 971 P.2d 758 (1999). But those cases conflict with the plain language of K.S.A. 59-

32

1504. A better reading of the relevant text is that the text addresses two categories of litigants: (1) those who act in good faith to admit a will to probate, "whether successful or not"; and (2) those who "successfully" prevent a will from being probated. Older cases properly classify probate litigants seeking attorney fees into these two groups. See *In re Estate of Carothers*, 3 Kan. App. 2d 156, 158, 591 P.2d 1091 (1979).

Oborny falls into the first category, if any. She contends that she prosecuted this case in good faith and that the district court's finding that the purported codicil was not signed by Field does not constitute a finding of bad faith because it cannot be proved that she forged the purported codicil. Oborny argues that the protracted litigation and voluminous record proves this matter is a real controversy. FHSU counters that Oborny did not act in good faith or with just cause because she forged Field's signature and attempted to commit a fraud on the district court. FHSU also contends that the district court confused the issue by holding that Oborny's counsel had acted in good faith.

*Our Standard of Review*

We review a district court's decision to award attorney fees under K.S.A. 59-1504 for an abuse of discretion. See *In re Estate of Gardiner*, 29 Kan. App. 2d at 163; *In re Estate of Mildrexter*, 25 Kan. App. 2d at 838-39. "A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 106 (2013). We find an abuse of discretion here.

*Analysis*

To the extent the district court's decision to award attorney fees to Oborny was based on its belief that the "good faith" required by the fee statute is only that of counsel,

33

its decision was based on an error of law. That interpretation has been squarely rejected by the Supreme Court:

> "Under K.S.A. 59-1504, 'such person' to be allowed necessary attorney fees obviously means the person (Jennings-Irving) who defends or opposes is awarded the attorney fee, not his attorney. The attorney's rights are derivative of his client's rights. Only if the client has a claim to make or right to defend does the attorney become involved, and it is to his client that the attorney must look for reimbursement." *In re Estate of Robinson*, 236 Kan. 431, 437, 690 P.2d 1383 (1984).

No one asserts that Oborny's counsel acted in anything but good faith. But the controlling legal question is whether Oborny herself acted in good faith and with just cause, for the purpose of having the purported codicil admitted to probate.

To the extent the district court may have found that Oborny herself acted "in good faith and with just cause," its decision to award attorney fees to Oborny was based on an error of fact. Neither K.S.A. 59-1504 nor our cases applying it attributes any peculiar definition to the phrase "good faith." See, e.g., *In re Estate of Engels*, 10 Kan. App. 2d 103, 107, 692 P.2d 400 (1984); *In re Estate of Strader*, No. 115,418, 2017 WL 2212089 (Kan. App. 2017) (unpublished opinion). We thus give that term its usual meaning: "A state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." Black's Law Dictionary 808 (10th ed. 2014). See generally K.S.A. 84-1-201(19) ("'Good faith' means honesty in fact in the conduct or transaction concerned."); *Goodyear, Administratix v. Railway Co.*, 114 Kan. 557, 561, 220 P. 282 (1923) (good faith means "without fraud, duress, concealment, and assumes a lack of mental incapacity or mutual mistake, and upon good consideration"), *disapproved of on other grounds by Prowant, Administratix v. Kings-X*, 185 Kan. 602, 347 P.2d 254 (1959).

A finding that Oborny acted in good faith and with just cause by attempting to admit the purported codicil to probate is irreconcilably inconsistent with the district court's substantive findings, which we uphold on appeal. Clear and convincing evidence shows that Oborny, or by someone at her behest, forged Field's signature on the purported codicil. Oborny then attempted to deceive the court into believing that Field had signed the purported codicil by trying to admit the purported codicil to probate knowing that it was not what it purported to be. Her acts raise the spectre of forgery, making a false writing, or fraud on the court. See 71 C.J.S., Pleading § 684 ("A fraud on the court, as would warrant striking of pleadings, is an unconscionable plan or scheme that is designed to improperly influence the court in its decision.").

> "If a person may consult an attorney and learn from the attorney there is serious defect in some instrument of writing on which he must rely to maintain his action, and then cause another document which eliminates the defect to be forged . . . and then retain other counsel to represent him, however innocently, and attempt to maintain an action on such forged instrument, he endeavors to perpetuate a fraud not only on his adversary but upon the court." *In re Estate of Koellen*, 167 Kan. 676, 683, 208 P.2d 595 (1949).

Oborny did not act in good faith as is necessary for a fee award under K.S.A. 59-1504. See *In re Graham's Estate*, 156 Fla. 421, 428, 23 So.2d 485 (1945) (Proponent of forged will, who also participated in forgery, engaged in "utmost bad faith" by offering it to probate.).

Because the district court abused its discretion in awarding Oborny her attorney fees, we reverse the fee award.

SHOULD OBORNY RECEIVE ATTORNEY FEES FOR PROSECUTING THIS APPEAL?

Oborny's counsel has also requested attorney fees in the amount of $134,048 for his services on appeal. He seeks fees pursuant to Kansas Supreme Court Rule 7.07(b)(1),

which states that "[a]n appellate court may award attorney fees for services on appeal in a case in which the district court had authority to award attorney fees." (2017 Kan. S. Ct. R. 51). He then contends that the district court had authority to award fees pursuant to K.S.A. 59-1504.

But we have found that the district court lacked authority to award fees pursuant to that statute. We thus have no authority under Rule 7.07(b)(1) to award fees for services on appeal.

Affirmed in part and reversed in part.
Case No. 116,456 is affirmed. Case No. 117,079 is reversed.